KALPANA SRINIVASAN (237460)
ksrinivasan@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, California  90067-6029
[Tel.] (310) 789-3100
[Fax] (310) 789-3150

MAX L. TRIBBLE, JR. (Admitted *Pro Hac Vice*)
mtribble@susmangodfrey.com
JOSEPH S. GRINSTEIN (Admitted *Pro Hac Vice*)
jgrinstein@susmangodfrey.com
1000 Louisiana, Suite 5100
Houston, Texas  77002-5096
[Tel.] (713) 651-9366
[Fax] (713) 654-6666

*Attorneys for Defendants AliphCom and BodyMedia, Inc.*
(Additional Counsel for Defendants listed below signature line)

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FITBIT, INC.<br><br>           Plaintiffs,<br><br>   v.<br><br>ALIPHCOM d/b/a JAWBONE and BODYMEDIA, INC.<br><br>           Defendant. | Case No: 5:16-cv-00118-BLF<br><br>**DEFENDANTS ALIPHCOM, INC. d/b/a JAWBONE AND BODYMEDIA, INC.'S NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>Date:         January 5, 2017<br>Time:        9:00 AM<br>Courtroom:  3 – 5th Floor<br>Judge:      Hon. Beth Labson Freeman<br><br>JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

NOTICE OF MOTION ........................................................................................................... 1

I.           INTRODUCTION ..................................................................................... 1

II.          BACKGROUND ...................................................................................... 2

       A.    Procedural History .......................................................................... 2

       B.    The '543 Patent .............................................................................. 3

       C.    The '812 Patent .............................................................................. 4

       D.    The '971 Patent .............................................................................. 5

III.         LEGAL STANDARD ............................................................................. 7

       A.    Abstract subject matter is patent ineligible under 35 U.S.C. § 101 ........................ 7

       B.    Judgment on the pleadings is appropriate when asserted patents are directed toward ineligible subject matter ..................................................... 8

IV.        ARGUMENT .......................................................................................... 8

       A.    The '543 Patent .............................................................................. 9

            1.    The '543 Patent—which merely claims the age-old idea of measuring physical activity and telling a person how much activity has occurred—is directed toward ineligible subject matter. ........... 9

            2.    The '543 patent claims, individually or in combination, do not contribute an inventive concept that renders the material patent eligible. .............................................................................. 12

       B.    The '812 Patent ............................................................................ 13

            1.    The '812 Patent, which simply claims the notification of a user when a threshold amount of activity is exceeded, is directed toward ineligible subject matter. ............................................... 13

            2.    The '812 patent claims, individually or in combination, do not include an inventive concept. ............................................... 15

       C.    The '971 Patent ............................................................................ 17

            1.    The '971 Patent, which claims monitoring heart rate of a certain "data quality," is directed toward ineligible subject matter. ............ 18

2.     None of the '971 patent's claim limitations, individually or in combination, contributes an inventive concept that makes the material eligible for patent protection. ....................................................... 19

V.         CONCLUSION ................................................................................................... 19

1

## <u>TABLE OF AUTHORITIES</u>

2

3

### <u>CASES</u>

4

*Affinity Labs of Texas, LLC v. Amazon.com Inc.*,
    2016 WL 5335502 (Fed. Cir. Sept. 23, 2016) ................................................................... 15

5

*Affinity Labs of Texas, LLC v. DirectTV, LLC*,
    No. 2015-1845, 2016 WL 5335501 (Fed. Cir. Sept. 23, 2016) ....................................... 10

6

7

*Alice Corp. Pty. v. CLS Bank Int'l*,
    134 S. Ct. 2347 (2014) ............................................................................................. passim

8

*Bascom Global Internet Services, Inc. v. AT&T Mobility LLC*,
    2016 WL 3514158 (Fed. Cir. June 27, 2016) .......................................................... passim

9

10

*Bilski v. Kappos*,
    561 U.S. 593 (2010) ..................................................................................................... 7, 9

11

*buySAFE, Inc. v. Google, Inc.*,
    765 F.3d 1350 (Fed. Cir. 2014) ........................................................................................ 14

12

13

*Chavez v. United States*,
    683 F.3d 1102 (9th Cir. 2012) ........................................................................................... 8

14

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*,
    776 F.3d 1343 (Fed. Cir. 2014) ................................................................................. 10, 18

15

16

*CyberSource Corp. v. Retail Decisions, Inc.*,
    654 F.3d 1366 (Fed. Cir. 2011) ................................................................................... 2, 15

17

18

*Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*,
    758 F.3d 1344 (Fed. Cir. 2014) ......................................................................................... 9

19

*Eclipse IP LLC v. McKinley Equip. Corp.*
    2014 WL 4407592 (C.D. Cal. Sept. 4, 2014) .................................................................. 11

20

21

*Electric Power Group, LLC v. Alstom S.A.*,
    No. 2015-1778 (Fed. Cir. Aug. 1, 2016) ......................................................................... 2, 7

22

23

*Enfish, LLC v. Microsoft Corp.*,
    822 F.3d 1327 (Fed. Cir. 2016) ................................................................................... 9, 17

24

*In re BRCA1- & BRCA2-Based Hereditary Cancer Test Patent Litig.*,
    774 F.3d 755 (Fed. Cir. 2014) .................................................................................... 8, 9

25

26

*In re TLI Commc'ns LLC Patent Litig. V. AV Automotive, L.L.C.*,
    et al., 823 F.3d 607 (Fed. Cir. 2016) ............................................................................... 12

27

28

*In the Matter of Certain Wearable Activity Tracking Devices*,
    Inv. No. 337-TA-973........................................................................................... 1

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
    792 F.3d 1363 (Fed. Cir. 2015)....................................................... 2, 13, 15, 18

*Joao Bock Transaction Systems v. Fid. Nat. Info. Servs., Inc.*
    122 F. Supp. 3d 1322 (M.D. Fla. 2015) ........................................................ 11

*Mayo Collaborative Services v. Prometheus Laboratories, Inc.*,
    132 S.Ct. 1289 (2012) ................................................................................... 15

*Novo Transforma Techs., LLC v. Sprint Spectrum L.P.*,
    2015 WL 5156526 (D. Del. Sept. 2, 2015) ................................................... 11

*OIP Techs., Inc. v. Amazon.com, Inc.*,
    788 F.3d 1359 (Fed. Cir. 2015)................................................................. 8, 11

*Shortridge v. Found. Constr. Payroll Serv., LLC*,
    2015 WL 1739256 (N.D. Cal. Apr. 14, 2015) ................................................ 8

*Ultramercial, Inc. v. Hulu, LLC*,
    772 F.3d 709 (Fed. Cir. 2014)...................................................................... 10

## STATUTES

28 U.S.C. § 1659 ............................................................................................... 3

35 U.S.C. § 101 ......................................................................................... passim

35 U.S.C. § 271 ............................................................................................... 2

1    <u>**NOTICE OF MOTION**</u>

2        PLEASE TAKE NOTICE that on January 5, 2017 at 9:00 AM, or as soon thereafter as

3    this matter may be heard before Judge Beth Labson Freeman, in Courtroom 3, 5th Floor, United

4    States Courthouse, 280 South 1st St., San Jose, California, Defendants AliphCom, Inc. d/b/a

5    Jawbone and BodyMedia, Inc. ("Jawbone" or "Defendants") will, and hereby do, move the Court

6    to grant Jawbone's Motion for Judgment on the Pleadings that the Asserted Patents are Directed

7    to Ineligible Subject Matter Under 35 U.S.C. § 101.

8    **I.    INTRODUCTION**

9        This case is one of ***four*** patent infringement lawsuits Plaintiff Fitbit, Inc. ("Fitbit") has

10   filed against business rival Jawbone in three different tribunals across the United States since

11   September 2015.[1] Not surprisingly, this blunderbuss attack emphasized quantity over quality: the

12   nine patents Fitbit asserts across the four cases recite tired, well-known ideas—such as recording

13   physical   activity   that   exceeds   certain   predetermined   thresholds—implemented   using

14   commonplace technology like sensors and generic computer memory. Indeed, less than three

15   months ago, the administrative law judge in the International Trade Commission declared the

16   parent of one of Fitbit's three chosen patents for this case, U.S. Patent No. 8,909,543 ("the '543

17   patent"), invalid under 35 U.S.C. § 101. *See* <u>Exhibit 1</u> at 49-58.[2]

18       The '543 patent, along with the other two patents Fitbit asserts in this case, U.S. Patent

19   Nos. 9,031,812 ("the '812 patent") and 9,042,971 ("the '971 patent"), should never have been

20   granted in the first place because they claim abstract subject matter that is ineligible for patent

21   protection under § 101. The '543 patent, entitled "Methods for Detecting and Recording Physical

22   Activity of Person," discloses the simple idea of measuring a person's physical activity,

23   displaying the amount of completed physical activity to the person, and then sending the activity

24

25   [1] *See Fitbit, Inc. v. AliphCom d/b/a BodyMedia, Inc.*, No. 5:15-cv-04073-EJD (N.D. Cal.) (filed September 8, 2015); *Fitbit, Inc. v. AliphCom d/b/a BodyMedia, Inc.*, No. 1:15-cv-00990-UNA (D. Del.) (filed October 29, 2016); *In the Matter of Certain Wearable Activity Tracking Devices*, Inv. No. 337-TA-973 (U.S. International Trade Commission) (submitted November 2, 2015).

26   [2] Petitioned for review, the Commission chose not to take review of the ALJ's determination of invalidity for U.S. Patent No. 9,089,760 ("the '760 patent"). *See* <u>Exhibit 2</u> at 2. The '543 patent is a continuation of the '760 patent, and shares its specification. *See* <u>Exhibit 3</u> ('543 patent) at 1 (stating that patent is a continuation of Application No. 13/869,670); <u>Exhibit 4</u> ('760 patent) at 1 (listing application number as 13/869,670).

27

28

data to a generic secondary device. *See* <u>Exhibit 3</u>. The '812 patent, "Notifications on a User Device Based on Activity Detected by an Activity Monitoring Device," is highly similar, disclosing the use of "activity metrics" such as stair steps that could be measured by the device. *See* <u>Exhibit 5</u> ('812 patent). The '971 patent, entitled "Biometric Monitoring Device with Heart Rate Measurement Activated by a Single User-Gesture," claims straightforward measurement of a certain quality of heart rate in response to a signal from a user. Each of these patents discloses methods that can—and have—been performed using nothing more than the human mind. As the Federal Circuit has held, these methods are therefore "unpatentable abstract ideas." *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1371 (Fed. Cir. 2011); *see also Electric Power Group, LLC v. Alstom S.A.*, No. 2015-1778, ---- F.3d ---, slip op. at 11 (Fed. Cir. Aug. 1, 2016) (explaining that claims that "specify what information . . . is desirable to gather, analyze, and display" but "do not include any requirement for performing the claimed functions of gathering, analyzing, and displaying . . . by use of anything but entirely conventional, generic technology" are ineligible for patent protection); *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1367 (Fed. Cir. 2015) (stating that certain ideas "involving methods of organizing human activity" had been found abstract in the Federal Circuit and the Supreme Court).

## II.   BACKGROUND

### A.   Procedural History

Jawbone and Fitbit are competitors in the market for wearable devices that track physical activity, sleep, and other health and fitness data ("wearable activity devices"). Beginning just over a year ago, in September 2015, Fitbit initiated an array of proceedings against Jawbone in Delaware, California, and Washington, D.C., alleging patent infringement under 35 U.S.C. § 271. Fitbit filed this case on September 3, 2015, in the District of Delaware, accusing Jawbone's UP line of wearable activity devices. *See* Dkt. No. 1. Fitbit filed its next patent infringement lawsuit against Jawbone five days later, on September 8, 2015, in the Northern District of California. *See* Case No. 5:15-cv-04073-EJD, Dkt. No. 1. On October 29, 2015, Fitbit filed yet another case against Jawbone, again in the District of Delaware, alleging infringement of three patents against the same UP products that Fitbit had accused in its two previous suits. D. Del. 15-cv-990, Dkt.

No. 1. Fitbit instigated its fourth and final proceeding with a complaint that initiated an investigation in the International Trade Commission, on November 2, 2015 (Investigation No. 337-TA-973), claiming infringement of the same patents asserted in the second Delaware case. The second Delaware case (No. 15-cv-990) was therefore mandatorily stayed under 28 U.S.C. § 1659. *See* Exhibit 6. The district court in Delaware transferred this case to this district on December 22, 2015. *See* Exhibit 7.

### B.     The '543 Patent

The '543 patent was filed on January 27, 2014, and granted on December 9, 2014. It is a continuation of Application No. 13/869,670, which issued as the '760 patent. *See* Exhibits 3,4. Fitbit asserts claims 20 and 25-29 of the '543 against the Jawbone UP Move product. *See* Declaration of Kalpana Srinivasan ("Srinivasan Decl.") ¶ 13.

The specification for the '543 patent identifies the "challenge" of attempting to motivate individuals to engage in exercise due to the pervasive "problem" of obesity. *See* Exhibit 3 at 2:11-12. To address that challenge, the '543 specification sets out "a system and method for encouraging physical activity" through the use of an interactive "coupon" which becomes redeemable based on the "completion of physical activity for a predetermined amount and/or predetermined period of time." *Id.* at 1:25-30. The claims Fitbit asserts in this case are limited to method claims, and are directed to the idea of using a device to display an amount or completion of an individual's physical activity using a progression of light emitting diodes ("LEDs"). Claim 20 is the only asserted independent claim:

> A method, comprising:
>
> providing a band defined to be worn by a person, the band comprising a flexible material, the band including a motion detection component and a series of light emitting diodes;
>
> detecting and recording movement of the person by use of the motion detecting component;
>
> controlling illumination of the series of light emitting diodes such that individual light emitting diodes of the series of light emitting diodes turn on to emit light in a progression from one end of the series of light emitting diodes toward another end of the series of light emitting diodes, wherein an amount of the progression is

1    based on the amount of movement of the person recorded using the motion
2    detecting component; and

3    communicating data associated with the amount of recorded movement of the
     person to a secondary electronic device.

4    *Id.* at 26:45-62. This claim describes the ordinary process of measuring a user's movement and

5    then communicating information about that movement to the user via a secondary device and a

6    series of lights. Dependent claims 25-29 add generic limitations that specify either the type of

7    secondary device (such as a "computer" or a "cell phone" – claim 28), the method of

8    communicating activity data to the secondary device (for example, using a "transmitter" – claim

9    25); or whether the device's simple components are removable (claim 29). *Id.* at 27:11-28:9.

10        **C.    The '812 Patent**

11        The '812 patent was filed on May 6, 2014 and granted on May 12, 2015. Fitbit asserts

12   claims 1-6, 9-15, 18-23, and 25-26 of the '812 patent. *See* Srinivasan Decl. ¶ 13. Like the '543

13   patent, the '812 patent discloses methods for tracking a user's activity, comparing that activity

14   information to certain activity thresholds, and then displaying information related to a user's

15   physical activity to the user. The '812 also includes the step of displaying activity information to

16   a user at a predetermined or specified date, time, or "time window." *See, e.g.*, Exhibit 5 ('812

17   patent) at 25:23-43; 27:11-32. Claim 1 is representative of independent claims 1, 9, 18, and 25:

18        A method for generating a notification on a mobile device, comprising:
19
20        establishing a wireless connection to an activity monitoring device;

21        receiving activity data from the activity monitoring device via the wireless
22        connection;

23        processing the activity data to determine an activity metric for a user of the
          activity monitoring device;

24        comparing the activity metric against a predefined threshold, the predefined
25        threshold being mapped to a notification message;

26        in response to determining that the activity metric reaches or exceeds the
          predefined threshold, scheduling the notification message for display on the
27        mobile device at a specified date and time;

28

wherein the notification message is displayed on a mobile device at the specified date and time, the display of the notification message providing access to an application for interfacing with the activity monitoring device;

wherein the method is executed by at least one processor.

*Id*. at 25:23-43. Dependent claims 2-6, 10-16, 19-22, and 26 add descriptions of potential notification methods (such as a "banner" or a "badge" or "push notification" – claims 2, 18, and 22), potential "activity metrics" (for example, steps taken or floors climbed – claims 4 and 13), and targeted amounts of physical activity to be recorded ("less than 100%, 100%, or greater than 100% of the activity goal" – claims 6 and 15). *See id.* at 25:44-66; 26:38-63; 27:33-50;28:1-5, 34-40.

### D.    The '971 Patent

The '971 patent was filed on January 13, 2014 and granted on May 26, 2015.  *See* <u>Exhibit 8</u> ('971 patent). Fitbit asserts claims 1, 22, and 25-28 of the '971 patent. *See* Srinivasan Decl. ¶ 13. The '971 patent describes user interaction triggering the measurement of heart rate information, and the measurement continuing as long as the heart rate information is of a certain predetermined quality. Fitbit asserts one independent apparatus claim (claim 1) and one independent method claim (claim 22). Claim 1 reads:

An apparatus comprising:

one or more biometric sensors comprising a heart rate sensor;

an activator of the heart rate sensor;

a heart rate sensor surface area through which the heart rate sensor can collect heart rate data from a user;

an activator surface area through which the activator can receive activation signals from the user;

at least one processor; and

a memory,

wherein:

the one or more biometric sensors, the activator, the at least one processor, and the memory are communicatively connected, and

1

2   the memory stores computer-executable instructions for controlling the at least one processor to cause the heart rate sensor to:

3

4   start collecting heart rate data through the heart rate sensor surface area in response to the activator receiving an activation signal through the activator surface area caused by a single user-gesture; and

5

6   automatically stop collecting heart rate data when a heart rate reading of a predetermined level of heart rate data quality is obtained and remain in a state that does not collect heart rate data until another activation signal caused by a new user-gesture is received without requiring further user-gestures in addition to the single user-gesture.

7

8

9   Exhibit 8 at 41:8-35. Put simply, claim 1 of the 971 patent describes generic computer

10   components in a conventional configuration that allows a user to initiate a heart rate

11   measurement. Claim 22 sets out the following method:

12   A method for monitoring heart rate using a biometric monitoring device, comprising:

13

14   receiving, by an activator, an activation signal representing a single user-gesture by a user;

15   activating a heart rate sensor, in response to the activation signal, to start collecting heart rate data from the user;

16

17   providing user feedback, through a feedback mechanism, with reference to the collected heart rate data without requiring further user-gestures in addition to the single user-gesture; and

18

19   causing the heart rate sensor to stop collecting heart rate data when a heart rate reading of a predetermined level of heart rate quality is obtained without requiring further user-gestures in addition to the single user-gesture.

20

21   *Id.* at 43:3-18. Claims 25 through 28, which depend from claim 22, define various types of user

22   feedback (for example, an indication that the heart rate collection has succeeded or failed – claims

23   25 and 26) and an additional step, analogous to that contained within the apparatus of claim 1,

24   wherein the heart rate sensor does not re-activate after stopping until another "user-gesture" is

25   received by the device. *See id.* at 44:3-21.

26

27

28

1    **III.   LEGAL STANDARD**

2

      **A.      Abstract subject matter is patent ineligible under 35 U.S.C. § 101**

3       A patent may be obtained for "any new and useful process, machine, manufacture, or

4 composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. However,

5 "[l]aws of nature, natural phenomena, and abstract ideas" are implicitly excluded from the

6 possibility of patent protection. *See Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354

7 (2014). In *Alice*, the Supreme Court established a two-step analysis to determine whether the

8 subject matter claimed by a patent was an abstract idea ineligible for protection. *Id*. at 2355. The

9 purpose of the *Alice* inquiry is to prevent a patent from "pre-empt[ing] the use of [a given]

10 approach in all fields," thereby "effectively grant[ing] a monopoly over an abstract idea." *Id*. at

11 2354 (quoting *Bilski v. Kappos*, 561 U.S. 593, 611-612 (2010)) (alterations added).

12       The first step of the *Alice* test requires a court to determine whether the claims of a patent

13 are "directed to one of th[e] patent-ineligible concepts," such as an abstract idea. *Id*. (alteration

14 added). If a patent's claims are not directed to an ineligible concept, the inquiry is over. *See id*. If

15 a court determines that a patent's claims are directed toward an abstract idea, the court proceeds

16 to *Alice* step 2 to determine whether the claims contain "an element or combination of elements

17 that is sufficient to ensure that the patent in practice amounts to significantly more than a patent

18 upon the [ineligible concept] itself." *Id*. (internal quotation marks omitted and alteration in *Alice*).

19       In order to determine whether a patent claim is directed to an abstract idea, a court

20 "look[s] at the focus of the claims, their character as a whole . . . ." *Electric Power Group, LLC v.*

21 *Alstom S.A.*, No. 2015-1778, --- F.3d ---, slip op. at 6 (Fed. Cir. Aug 1, 2016) (internal quotation

22 marks omitted). As the Federal Circuit has recently explained, a court at *Alice* step 1 looks to an

23 "inventions' basic trust." *Bascom Global Internet Services, Inc. v. AT&T Mobility LLC*, 2016 WL

24 3514158, *5 (Fed. Cir. June 27, 2016). In addition, *Alice* step 1 is devoted to the determination of

25 whether "the focus of the claims is on [a] specific asserted improvement in computer capabilities .

26 . . or instead, on a process that qualifies as an abstract idea for which computers are invoked

27 merely as a tool." *Id*. at *5.

28       If a court determines that a patent claim is directed to an abstract idea, *Alice* step 2

instructs that a court should "examine the elements of the claim to determine whether it contains an inventive concept sufficient to transform the claimed abstract idea in to a patent-eligible application." *Alice*, 134 S. Ct. at 2357 (internal quotation marks omitted). The Supreme Court has further instructed that identifying generic, pre-existing computer components to implement an abstract idea do not transform that idea into material that is patent eligible. *See id*. at 2358. In order to survive an *Alice* inquiry, a patent that claims only known computer elements must teach a "non-conventional and non-generic arrangement of known, conventional pieces." *Bascom*, 2016 WL 3514158, at *6.

### B.    Judgment on the pleadings is appropriate when asserted patents are directed toward ineligible subject matter

A court may grant judgment on the pleadings where, "accepting all factual allegations in the complaint as true . . . there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law." *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012). Whether a patent covers patent-eligible subject matter is an issue of law appropriately determined on the pleadings. *See, e.g.*, *In re BRCA1- & BRCA2-Based Hereditary Cancer Test Patent Litig.*, 774 F.3d 755, 759 (Fed. Cir. 2014); *see also OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1360 (Fed. Cir. 2015); *Shortridge v. Found. Constr. Payroll Serv., LLC*, 2015 WL 1739256, at *1 (N.D. Cal. Apr. 14, 2015) (granting judgment of subject matter ineligibility on the pleadings). Further, the Federal Circuit has stated that reviewing patent eligibility under 35 U.S.C. § 101 early-on in litigation both "conserves scarce judicial resources and spares litigants the staggering costs associated with discovery and protracted claim construction" and "works to stem the tide of vexatious suits brought by owners of vague and overbroad" patents. *OIP Techs.*, 788 F.3d at 1364.

## IV.   ARGUMENT

The '543, '812, and '971 patents fail at both steps of the *Alice* inquiry because they are directed toward age-old, abstract ideas like measuring physical activity and heart rate, and because nothing in their asserted claims transforms those ancient, abstract ideas into novel, inventive concepts.

Two of the asserted patents, the '543 and the '812, are directed toward the abstract process of measuring activity, comparing amounts of physical activity to certain thresholds, and then telling a user about the amount of activity that occurred. The '971 patent is directed simply to measuring heart rate when there is a strong (or otherwise predetermined) heart rate signal and again conveying this information to a user. The specific way in which the '543 and '812 claim activity measurement and tracking contribute nothing inventive or limiting to that abstract concept. Likewise, the '971 does not teach any novel technique that renders its abstract heart rate measurement method more concrete. Fitbit's three asserted patents in this case seek to monopolize the general concepts of activity and heart rate measurement, and should be invalidated under 35 U.S.C. § 101. *See Bilski*, 561 U.S. at 611-12. The court need not resolve any issue of claim construction or fact in order to grant judgment on the pleadings pursuant to Federal Rule 12(c). *See, e.g.*, *BRCA1- & BRCA2-Based Hereditary Cancer Test Patent Litig.*, 774 F.3d at 759.

## A.      The '543 Patent

The '543 patent claims the basis steps of detecting a person's movement, notifying a person of the amount of movement detected, and sending data about the recorded movement to a secondary device. *See, e.g.*, Exhibit 3 at 26:45-64. This idea—which is not improved by any inventive limitation—is precisely the type of concept declared unpatentable by *Alice* and subsequent case law. *See, e.g.*, *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1351 (Fed. Cir. 2014) (stating that claims directed toward a general process for combining data sets into a device profile were "so abstract and sweeping as to cover any and all uses of a device profile") (internal quotation marks omitted).

> 1.      *The '543 Patent—which merely claims the age-old idea of measuring physical activity and telling a person how much activity has occurred—is directed toward ineligible subject matter.*

In determining whether a patent is directed to an "abstract idea" as defined in *Alice* step 1, courts consider "the focus of the claims" and "their character as a whole." *Electric Power*, Slip Op. at 6; *see also Bascom*, 2016 WL 3514158, at *5. Claims must be considered in light of the patent's specification. *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016).

1    The focus of the claims in the '543 patent can be broken down into two steps: 1) detecting

2    and tracking a user's activity, and 2) notifying the user of the amount of activity the device has

3    detected. *See, e.g.*, Exhibit 3 at 26:45-64. Humans routinely perform those methods without the

4    aid of any device: consider a runner marking her number of laps around a track with a pencil and

5    paper, or a tennis player noting that he has hit twenty practice serves by counting the number of

6    tennis balls across the net. Tracking activity and notifying the active person of the amount of

7    activity is an idea that is "routine," "long prevalent," and "conventional"—in the words of the

8    Federal Circuit, it is in the "*Alice* zone." *See Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 714

9    (Fed. Cir. 2014).

10    First, independent claim 20's "detecting and recording movement by the person by use of

11    [a] motion detection component" is no different from collecting, recognizing, and storing data,

12    which the Federal Circuit has held is an abstract idea. *See Content Extraction & Transmission*

13    *LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) ("The concept of

14    data collection, recognition, and storage is undisputedly well-known. Indeed, humans have

15    always performed these functions."). The specification confirms that this detection and recording

16    of movement is nothing more than routine data collection. *See, e.g.*, Exhibit 3 at Abstract ("A

17    motion detection component is operated to detect movement of the motion detection component.

18    The movement detected by the motion detection component is recorded."); 3:5-6 ("The

19    application comprises a coupon that detects physical activity of a user using a motion detector.").

20    This method is an unpatentable abstract idea. *See Content Extraction*, 776 F.3d at 1347; *see also*

21    *Affinity Labs of Texas, LLC v. DirectV, LLC*, No. 2015-1845, 2016 WL 5335501, at *3 (Fed.

22    Cir. Sept. 23, 2016) (explaining that "a broad and familiar concept concerning information

23    distribution that [was] untethered to any specific or concrete way of implementing it" was

24    ineligible subject matter).

25    The next limitation of independent claim 20 recites the illumination of LEDs to notify a

26    user of the amount of physical activity that has been detected. *See* Exhibit 3 at 26:52-59. Just as

27    courts have recognized that the concept of data collection is abstract, courts have also stated that

28    patents that claim user notifications are directed toward abstract ideas. For example, in *Joao Bock*

1    *Transaction Systems v. Fid. Nat. Info. Servs., Inc.*, the court explained that claims relating to an

2    account holder "receiving notification to approve or deny a transaction or that a transaction has

3    been approved or denied" were directed to an abstract concept. 122 F. Supp. 3d 1322, 1331 (M.D.

4    Fla. 2015). Likewise, the court in *Eclipse IP LLC v. McKinley Equip. Corp.* explained that

5    "initiating a notification communication to a personal communication device . . . relating to a task

6    to be performed" and then "receiving a response from the [ ] personal communications device [ ]

7    indicating whether or not the party associated with the personal communications device will

8    perform the task" was abstract subject matter ineligible for patent protection. 2014 WL 4407592,

9    *6-7 (C.D. Cal. Sept. 4, 2014). The court explained that the steps for giving and receiving the

10   notification "can be performed by a person talking on the phone." *Id*. Further, the court stated that

11   the fact that the method was performed "in connection with a computer-based notification

12   system" did not change the fact that the idea was abstract because the invention required no

13   special equipment to implement or achieve its benefits. *See Id*.; *see also Novo Transforma Techs.,*

14   *LLC v. Sprint Spectrum L.P.*, 2015 WL 5156526, at *3 (D. Del. Sept. 2, 2015) (explaining that a

15   "process for delivering messages from a sender to a recipient over a communication network"

16   which included "an automatic notification . . . provided to the sender upon receipt of the message

17   by the recipient" was an abstract process.).

18       Finally, the step of "communicating data with the amount of recorded movement of the

19   person to a secondary electronic device" recited in claim 20 does not render the claim less

20   abstract. Transmitting data in a broad, unspecified way to an "electronic device" that is also not

21   defined is an abstract concept. *See, e.g.*, *Electric Power*, Slip Op. at 11 (explaining that

22   performing functions using "entirely conventional, generic technology" was unpatentable

23   material); *see also OIP Techs.*, 788 F.3d at 1363 ("At best, the claims describe the automation of

24   the fundamental economic concept of offer-based price optimization through the use of generic-

25   computer functions."). As the ALJ has already held about the parent patent of the '543, the '760,

26   is directed toward an abstract idea and is invalid under 35 U.S.C. § 101. *See* <u>Exhibit 1</u> at 49-58.

27

28

2.    *The '543 patent claims, individually or in combination, do not contribute an inventive concept that renders the material patent eligible.*

Because the '543 patent is directed toward abstract subject matter, it is necessary to evaluate the patent under the test in *Alice* step 2. At that step, courts "consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application." *Bascom*, 2016 WL 3514158, at *4 (internal citations omitted).

The individual elements of the independent claims in the '543 patent are basic and fundamental: providing a band to a person, detecting and recording movement, giving a notification to a user of the amount of movement completed, and communicating data to an unspecified electronic device. *See, e.g.*, Exhibit 3 at 26:45-64. The fact that the notification is given using LEDs does not add an inventive concept, because LEDs are merely a conventional piece of technology that the claims recite operating in an ordinary, conventional way. *See, e.g.*, *In re TLI Commc'ns LLC Patent Litig. V. AV Automotive, L.L.C. et al.*, 823 F.3d 607, 613 (Fed. Cir. 2016) ("It is well-settled that mere recitation of concrete, tangible components is insufficient to confer patent eligibility to an otherwise abstract idea. Rather, the components must involve more than performance of well-understood, routine, conventional activities previously known to the industry.") (internal alteration and quotation marks omitted) (citing *Alice*, 134 S.Ct. at 2359). Indeed, the '543 repeatedly emphasizes that LEDs are merely one of several known, interchangeable technologies for performing the generic function of communicating information to a user. *See, e.g.*, Exhibit 3 at 15:10–15, 16:28–32, 17:11–15, 17:39–43, 17:66–18:4, 18:29–33 (each referring to "an enunciation device which may include a liquid crystal display, light emitting diode display or other means to store or communicate the resulting information to the user.").

The individual dependent claims of the '543 patent also offer no inventive concept. Instead, they teach the wireless communication of activity data to a secondary device using a generic "transmitter" (claim 25), using a transmitter in accordance with an unspecified "communication protocol" (claim 26), having a secondary device that is a "computer" (claim 27) or a "game" or a "cell phone" (claim 28), or having a motion detection component and LEDs that

are removable from the device band (claim 29). None of those components is novel or uses a traditional component in a novel fashion, such that the abstract material claimed is transformed into eligible subject matter under 35 U.S.C. § 101. *See, e.g.*, *Bascom*, 2016 WL 3514158, at *6 (explaining that "[t]he inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art" and "can be found in the non-conventional and non-generic arrangement of known, conventional pieces.").

Finally, the elements of the independent claims and the dependent claims, considered as an ordered combination, also do not add an inventive concept to the claimed subject matter. Rather, the '543 patent claims the ordinary process of tracking and recording activity, notifying the user of the amount of activity recorded, and communicating that data to a generic secondary device. Nothing about the combination of these simple steps saves the methods in the '543 patent from the realm of the abstract.

## B.   The '812 Patent

Similar to the '543 patent, the '812 patent also claims material related to activity tracking and notifying a user of the amount of activity tracked. Specifically, the '812 discloses connecting a mobile device to an activity monitoring device, receiving activity data on the mobile device and using the data to determine an "activity metric," comparing the metric to a predefined threshold associated with a notification message, and displaying the notification on the mobile device at a set date or time. *See, e.g.*, Exhibit 5 at 25:23-43. However, nothing about this method is novel or improves on the ways in which people have measured their physical activity throughout time— with or without the aid of computers. Indeed, the measurements and tracking claimed in the '812 patent "could still be made using a pencil and paper with a simple notification device." *Intellectual Ventures*, 792 F.3d at 1368.

> 1.   *The '812 Patent, which simply claims the notification of a user when a threshold amount of activity is exceeded, is directed toward ineligible subject matter.*

The independent claims of the '812 include connecting an activity monitoring device to a "mobile device" or "user device." *See, e.g.*, Exhibit 5 at 25:23-26 ("[a] method for generating a notification on a mobile device, comprising: establishing a wireless connection to an activity

monitoring device . . . ."); 26:14-17 ("[a] server-executed method for presenting a notification on a mobile device, comprising: establishing communication with the mobile device . . . ."); 27:11-19 ("[a] method for presenting a notification on a user device, comprising: . . . receiving activity data measured by an activity monitoring device . . . ."); 28:13-16 ("[a] method for triggering a notification to a user of an activity monitoring device, comprising: receiving activity data from one or more sensors of an activity monitoring device . . . ."). The Federal Circuit has held that this critical portion of the claimed invention—the transfer of data from one place to another—without any novel addition is an unpatentable concept. *See, e.g.*, *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) ("That a computer receives and sends the information over a network—with no further specification—is not even arguably inventive.").

The '812 also claims the elements of tracking activity and generating a notification message for the user of the amount of activity that has occurred. *See, e.g.*, Exhibit 5 at 25:27-28, 38-43; 26:28-20, 33-38; 27:11-19, 28-32; 28:14-16, 28-32. As explained above in the context of the '543 patent, courts have also declared that the ideas of collecting data (such as activity data) and notifying a user are abstract. *See supra* § IV.A.1. The claims in the '812 patent do not describe any way of improving the generic processes of gathering activity data and giving the user a notification about that data.

The addition of comparing activity data to predetermined thresholds does not render the subject matter claimed in the '812 patent more concrete. Indeed, using thresholds to measure activity is ubiquitous in sports: umpires must determine whether a batter's half-swing counts as a strike. Line judges in tennis must watch to see if a server's foot moves into the baseline and causes a fault. A runner may decide to sprint for one mile, and then slow the pace to a jog. In each of these instances, athletes and judges compare an amount of activity to a "predetermined" threshold to figure out whether or not a certain amount of activity "counts." The same is true with the '812 patent: as the claims describe, the method involves comparing an "activity metric" comprised of activity data with a "notification threshold" and then, if the notification threshold is met, triggering presentation of the notification method at a specified date and time. *See* '812 patent claims 1 ("in response to determining that the activity metric reaches or exceeds the

1    predefined threshold, scheduling the notification message for display on the mobile device at a

2    specified date and time"), 9, 18, 25 ("in response to determining that the activity metric reaches or

3    exceeds the predefined threshold, establishing communication with a user device, and triggering

4    display of the notification message on the user device"). Yet—just as when an umpire calls a

5    batter "out"—these are precisely the type of "method[s] that can be performed by human thought

6    alone" that the Federal Circuit has held ineligible for patent protection under 35 U.S.C. § 101. *See*

7    *CyberSource*, 654 F.3d at 1373; *see also Intellectual Ventures*, 792 F.3d at 1367 (explaining that

8    certain ideas "involving methods of organizing human activity" had been found abstract in the

9    Federal Circuit and the Supreme Court).

10        The claims in the '812 patent, which disclose only common ideas using generic computer

11   components, are directed toward abstract subject matter, and the '812 patent fails *Alice* step 1.

12                    2.    *The '812 patent claims, individually or in combination, do not include an*
                           *inventive concept.*
13

14        The '812 patent also fails *Alice* step 2 because none of the claim limitations adds an

15   inventive concept that renders the claimed material patent eligible. *See Alice*, 134 S. Ct. at 2355;

16   *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 132 S.Ct. 1289, 1294 (2012). The

17   independent claims of the '812 claim a method of notifying the user of the activity metric "at a

18   specified date and time" (claims 1, 18) or during a "time window" (claims 9, 25), but those

19   limitations are merely one among a "collection of instructions" that indicate the way in which a

20   notification will appear for a user via the claimed method. *See Affinity Labs*, 2016 WL 5335502,

21   at *4 (Fed. Cir. Sept. 23, 2016). Those instructions simply "state [the] functions in general terms,

22   without limiting them to technical means for performing the functions that are arguably an

23   advance over conventional computer and network technology." *See id.* Triggering a notification

24   to appear at a certain time is not an "advancement" or improvement over the abstract idea of

25   providing a notification—it is just a specified way of doing so.

26        The dependent claims of the '812 fare no better, either independently or as an ordered

27   combination. Generally, the dependent claims either define "activity metric" (as, for example,

28   steps taken, floors climbed, or calories burned – claims 4, 13, 23), set or define achievement

1    amounts to be displayed to a user (such as less than 100% of goal, 100% of goal, or greater than

2    100% of goal – claims 5,6,14 and 15), or specifies the type of user notification (such as a push

3    notification, an alert, a banner, or a badge – claims 19, 22). Similar to the use of LEDs in the '543

4    and the setting of time windows in the independent claims of the '812, further specifying "activity

5    metrics" or user notifications does not transform the abstract concept of notifying a person of his

6    activity level into a concrete idea that is patent eligible. Nor do any of the dependent claims, as a

7    combination of elements with the independent claims from which they depend, sufficiently limit

8    the abstract methods claimed so as not to preempt the entire field of activity tracking using

9    thresholds and notifications. *See Bascom*, 827 F.3d at 1352.

10        Fitbit may argue that the '812 patent's prosecution history proves that the patent claims

11    eligible subject matter, but that argument fails. During prosecution, the patent examiner initially

12    rejected claims 1-30 under § 101, explaining that the claims were "directed to the abstract idea of

13    scheduling a notification message based upon processed data that has determined whether an

14    activity metric has reached or exceeded a threshold." *See* <u>Exhibit 9</u> at 2. The examiner further

15    explained that the additional claim elements were nothing more than "generic computer

16    structure[s]" performing "generic computer functions" that were "well-understood, routine, and

17    conventional activities previously known" to the fitness industry. *See id*. The examiner then wrote

18    that those elements did not "provide meaningful limitation(s) to transform the abstract idea into a

19    patent eligible application of the abstract idea such that the claim(s) amount[ed] to something

20    significantly more than the abstract idea itself." *Id*. at 3. In response, the applicant amended

21    independent claims 1, 10, 20, and 28 to add the limitations that teach display of the notification at

22    a "specified date and time" or within a "time window" along with an application that connects to

23    the activity monitoring device and allows the user to interface with it. *See* <u>Exhibit 10</u> at 2, 5, 7, 9.

24    The examiner allowed the claims after those amendments, explaining that the applicants had

25    successfully passed *Alice* at step 2:

26        Applicant's amendments to claims 1, 10, 20, and 28 are sufficient to overcome the
     rejections under 35 U.S.C. § 101 because the limitations add "significantly more"
27        to the claim. By itself, displaying a message may be considered insignificant
     extra-solution activity, however, displaying a notification message on a mobile
28        device at a specified time and date where the notification message provides access

1

2    to an application for interfacing with an activity monitoring device where a
     wireless connection exists between the mobile device and the activity monitoring
3    device is not insignificant. Applicant has added unconventional steps that confine
     the claim to a particular useful application.

4    Exhibit 11 at 2.

5         The examiner's allowance and rationale—issued prior to *Enfish* and *Bascom* and without

6    any detailed analysis—does not withstand scrutiny under current Federal Circuit law. Contrary to

7    the examiner's assertion that the amended claims contain "unconventional steps," giving a

8    notification at a particular or set time is a basic step that has long existed in the form of alarms

9    and reminder notifications, enabled by machines like analog clocks but also by a wide variety of

10   software applications that use networks and the internet. Similarly, the fact that the claimed

11   notifications give access to an application for interfacing with the activity monitoring device is

12   also not "unconventional" and does not "limit" the claims in any meaningful way. Computers and

13   mobile devices have long been rife with programs and applications that provide "hyperlinks" to

14   other applications, programs, or webpages. The claims in the '812 patent "preempt[ ] all use of

15   the claimed abstract idea on generic computer components performing conventional activities."

16   *Bascom*, 827 F.3d at 1352. As the Federal Circuit clarified in *Bascom*, merely because more

17   detailed claims may "narrow the scope of protection through additional conventional steps for

18   performing the abstract idea, they did not make those claims any less abstract." *See id.* (internal

19   citation omitted). That is the case here: while the additional steps of giving a generic notification

20   at a specific time and connected to a means of interfacing with a mobile device "narrow the scope

21   of protection" of the claims that the examiner previously found invalid, *see* Exhibit 9, they do not

22   make the claims of the '812 patent any less abstract.

23        **C.    The '971 Patent**

24        Rather than activity tracking *per se*, the '971 patent is directed toward gathering and

25   storing heart rate data in response to user interaction. However, like the '543 and the '812 patents,

26   the '971 also uses generic computer components to implement an abstract idea. The '971 patent

27   contains independent apparatus and method claims that teach using unspecified biometric sensors

28   to collect heart rate data and then stop collecting data when the data is of a "predetermined"

quality. *See* <u>Exhibit 8</u> at 41:7-35; 43:4-18. This simple concept is no different from taking one's pulse: the '971 patent should not have been granted because it claims the abstract and straightforward idea of measuring heart rate only when the heart rate is strong enough to measure, or measuring heart rate only for a set period of time.

> 1. *The '971 Patent, which claims monitoring heart rate of a certain "data quality," is directed toward ineligible subject matter.*

The independent claims of the '971 patent all generally include the elements of (1) collecting heart rate data in response to a "user-gesture" and (2) ceasing the collection of heart rate data "when a heart rate reading of a predetermined level of heart rate data quality is obtained . . . ." *See* <u>Exhibit 8</u> at 41:7-35; 43:4-18. The specification indicates that the "predetermined level of heart rate data quality" could be a set period of time, such as three seconds or one or two minutes. *Id.* at 20:13-15. The specification also indicates that the "predetermined level of heart rate data quality" is simply a set, defined quality of heart rate reading. *See id.* at 2:30-32.

As discussed above, data collection is a fundamental process that the Federal Circuit has held is abstract and unpatentable. *See supra* § IV.A.1; *Content Extraction*, 776 F.3d at 1347 ("The concept of data collection, recognition, and storage is undisputedly well-known. Indeed, humans have always performed these functions."). The fact that the '971 also claims filtering the heart rate data or selecting the data to collect based on time or "data quality" does not save the claims from abstraction. As the Federal Circuit has recently explained, "filtering content is an abstract idea because it is a longstanding, well-known method of organizing human behavior." *Bascom*, 2016 WL 3514158, at *5; *see also Intellectual Ventures,* 792 F.3d at 1369 ("information tailoring is a fundamental…practice long prevalent in our system.…") (quotations omitted).

In this case, the apparatus and method claimed by the '971 can be implemented and achieved by simply putting one's fingers over one's wrist (the "user-gesture" activating heart rate data collection, *see* <u>Exhibit 8</u> at 41:28; 43:13), counting the pulses, and then stopping counting after either thirty seconds or detection of a weaker or hurried heart beat ("a predetermined level of heart rate data quality," *see id.* at 41:30; 43:15-16). Thus, the '971 threatens the very preemption that *Alice* described: a patent "disproportionately tying up" a fundamental idea like taking one's

1    pulse for a set period of time. *See Alice*, 134 S. Ct. at 2354. The '971 patent is directed toward an

2    abstract idea under step 1 of *Alice*.

3            2.    *None of the '971 patent's claim limitations, individually or in combination,*
               *contributes an inventive concept that makes the material eligible for patent*
4               *protection.*

5            The claim limitations in the '971 do not render the broad "invention" taught by the '971

6    more concrete. Independent claim 22 describes a method for providing "user feedback" about the

7    collected heart rate data through a "feedback mechanism." *See* <u>Exhibit 8</u> at 43:10-13. However,

8    this "feedback mechanism" is not defined and could be no different than a person's fingertips

9    when taking one's pulse. Likewise, dependent claim 25 specifies that the "user feedback

10   comprises an indication that heart rate data collection is successful." *See id*. at 44:3-5. But that

11   "feedback" could be the same as a person feeling through her fingertips that the pulse is strong

12   enough to measure. Dependent claim 27 teaches that the "user feedback" could comprise, *inter*

13   *alia*, average heart rate, minimum heart rate, or maximum heart rate. *Id*. at 9-17. Again, this type

14   of "feedback" could be achieved by using fingertips to measure one's pulse and watching the

15   clock to determine the heart rate. The combination of getting this feedback after putting one's

16   fingertips to one's wrist does not transform the concept into a concrete idea. Nothing of the

17   limitations of the '971 patent's independent or dependent claims, either individually or in an

18   ordered combination, contains an inventive concept. *See Bascom*, 827 F.3d at 1347.

19   **V.   CONCLUSION**

20           Fitbit's concerted effort to bury Jawbone with multiple lawsuits in multiple fora has

21   resulted in Fitbit's assertion of weak patents that contain no novel concepts. The '543 patent and

22   '812 patents, which both claim collecting activity data and then displaying it to a user, are

23   directed toward abstract ideas that people have always used when measuring movement for

24   fitness or sport. Likewise, the '971 patent teaches the abstract concept of taking one's pulse and

25   then stopping taking the pulse after time has passed or the quality of the heart rate changes. None

26   of the three patents contains claim limitations that convert the otherwise unpatentable subject

27   matter into material that is eligible for protection under 35 U.S.C. § 101. Jawbone respectfully

28

1  asks that the Court grant its motion for judgment on the pleadings according to Federal Rule

2  12(c).

3

4  Dated:  October 18, 2016

5                                                     **SUSMAN GODFREY L.L.P.**
                                                      KALPANA SRINIVASAN
                                                      MAX L. TRIBBLE, JR.
6                                                     JOSEPH S. GRINSTEIN

7                                                     GENEVIEVE VOSE WALLACE
                                                          (Admitted *Pro Hac Vice*)
8                                                     gwallace@susmangodfrey.com
                                                      EDGAR G. SARGEANT
9                                                         (Admitted *Pro Hac Vice*)
                                                      esargeant@susmangodfrey.com
10                                                    IAN B. CROSBY
                                                          (Admitted *Pro Hac Vice*)
11                                                    icrosby@susmangodfrey.com
                                                      E. LINDSAY CALKINS
12                                                        (Admitted *Pro Hac Vice*)
                                                      lcalkins@susmangodfrey.com
13                                                    1201 Third Avenue, Suite 3800
                                                      Seattle, Washington 98101-3000
14                                                    [Tel.] (206) 516-3880
                                                      [Fax] (206) 516-3883
15

16

17                                                    ELISHA BARRON
                                                          (Admitted *Pro Hac Vice*)
18                                                    ebarron@susmangodfrey.com
                                                      560 Lexington Avenue, 15th Floor
19                                                    New York, New York 10022-6828
                                                      [Tel.] (212) 336-8330
20                                                    [Fax] (212) 336-3800

21
                                                      By: */s/ Kalpana Srinivasan*
22                                                            Kalpana Srinivasan

23                                                    *Counsel for Defendants AliphCom d/b/a*
                                                      *Jawbone and BodyMedia, Inc.*
24

25

26

27

28