JOSH A. KREVITT (SBN 208552)
jkrevitt@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue, 47th Floor
New York, NY 10166
Tel:  (212) 351-4000
Fax:  (212) 351-4035

WAYNE M. BARSKY (SBN 116731)
wbarsky@gibsondunn.com
JASON C. LO (SBN 219030)
jlo@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2029 Century Park East
Los Angeles, CA 90067-3026
Tel:  (310) 552-8500
Fax:  (310) 551-8741

MARK N. REITER (*Pro Hac Vice*)
mreiter@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue
Dallas, TX 75201-6912
Tel:  (214) 698-3100
Fax:  (214) 571-2900

FREDERICK S. CHUNG (SBN 183337)
fchung@gibsondunn.com
Y. ERNEST HSIN (SBN 201668)
ehsin@gibsondunn.com
NEEMA JALALI (SBN 245424)
njalali@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA 94304
Tel:  (650) 849-5300
Fax:  (650) 849-5333

*Attorneys for Plaintiff Fitbit, Inc.*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FITBIT, INC., | Case No. 5:16-cv-00118-BLF |
| Plaintiff, | **PLAINTIFF FITBIT, INC.'S OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS** |
| v. | |
| ALIPHCOM d/b/a JAWBONE and BODYMEDIA, INC., | Date:        January 5, 2017<br>Time:        9 a.m.<br>Courtroom:  3<br>Judge:       Hon. Beth Labson Freeman |
| Defendants. | |

# TABLE OF CONTENTS

Page

I.      INTRODUCTION AND FACTUAL BACKGROUND ........................................................ 1

II.     LEGAL STANDARDS .................................................................................................. 3

        A.      Patent Eligibility Under Section 101 ........................................................... 3

                1.      Step One:  Whether Claims Are "Directed to" a Patent-Ineligible
                        Concept ........................................................................................... 4

                2.      Step Two:  Whether the Claims Contain an "Inventive Concept" ................... 5

        B.      Judgment on the Pleadings Under Rule 12(c) ............................................... 6

III.    ARGUMENT ................................................................................................................ 8

        A.      The '543 Patent Is Directed to Eligible Subject Matter ................................. 8

                1.      The '543 Patent Is Directed to a Specific Structure that Improves
                        Portable Activity Monitoring Technology ......................................... 8

                2.      Step One:  The '543 Patent Is Not Directed to an Abstract Idea ................... 10

                3.      Step Two:  The '543 Patent Contains an Inventive Concept ......................... 13

                4.      Jawbone's Claim Construction Arguments Undercut its Arguments ............. 14

        B.      The '812 Patent Is Directed to Eligible Subject Matter ............................... 15

                1.      The '812 Patent Is Directed to a Specific, Improved Notification System
                        for Portable Activity Monitoring Devices ....................................... 16

                2.      Step One:  The '812 Patent Is Not Directed to an Abstract Idea ................... 17

                3.      Step Two:  The Asserted Claims of the '812 Patent Contain an Inventive
                        Concept ......................................................................................... 18

        C.      The '971 Patent Is Directed to Eligible Subject Matter ............................... 20

                1.      The '971 Patent Is Directed to a Specific Combination of Hardware and
                        Software that Improves the Technology of Portable Activity Monitoring
                        Devices With a Heart Rate Monitor .............................................. 21

                2.      Step One:  The '971 Patent Is Not Directed to an Abstract Idea ................... 22

                3.      Step Two:  The '971 Patent Contains an Inventive Concept ......................... 24

IV.     CONCLUSION ............................................................................................................ 25

PLAINTIFF FITBIT, INC.'S OPPOSITION TO JAWBONE'S MOTION FOR JUDGMENT ON THE PLEADINGS
CASE NO. 5:16-CV-00118-BLF

1

# TABLE OF AUTHORITIES

2

Page(s)

3

**Cases**

4

*Accenture Global Servs., GmbH v. Guidewire Software, Inc.*,
728 F.3d 1336 (Fed. Cir. 2013)................................................................................................7

5

6

*Affinity Labs of Tex., LLC v. DIRECTV, LLC*,
838 F.3d 1253 (Fed. Cir. 2016)..............................................................................................12

7

8

*Alice Corp. Pty. v. CLS Bank Int'l*,
134 S. Ct. 2347 (2014) ..................................................................................................... *passim*

9

*Allen v. Cypress Vill., LTD.*,
No. 3:10-CV-994-WKW, 2011 WL 2559614 (M.D. Ala. June 27, 2011) ....................................14

10

11

*AMDOCS (ISRAEL) Ltd. v. Openet Telecom, Inc.*,
--- F.3d ----, 2016 WL 6440387 (Fed Cir. Nov. 1, 2016) ................................................8, 12, 20, 23

12

*Arrhythmia Research Tech., Inc. v. Corazonix Corp.*,
958 F.2d 1053 (Fed. Cir. 1992)................................................................................................7

13

14

*Bascom Global Internet Servs., Inc. v. AT&T Mobility, LLC*,
827 F.3d 1341 (Fed. Cir. 2016) ........................................................................................ *passim*

15

16

*Bilski v. Kappos*,
561 U.S. 593 (2010) ................................................................................................................3

17

18

*Cave Consulting Grp., Inc. v. Truven Health Analytics Inc.*,
No. 15-CV-02177-SI, 2016 WL 283478 (N.D. Cal. Jan. 25, 2016) ........................................7, 23

19

*Cronos Techs., LLC v. Expedia, Inc.*,
No. CV 13-1538-LPS, 2015 WL 5234040 (D. Del. Sept. 8, 2015) ..............................................19

20

21

*DDR Holdings, LLC v. Hotels.com L.P.*,
773 F.3d 1245 (Fed. Cir. 2014)........................................................................................6, 14, 20, 25

22

23

*Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*,
758 F.3d 1344 (Fed. Cir. 2014)..............................................................................................11

24

*Eclipse IP LLC v. McKinley Equip. Corp.*,
No. SACV 14-154-GW, 2014 WL 4407592 (C.D. Cal. Sept. 4, 2014)........................................13

25

26

*Elec. Power Grp., LLC v. Alstom S.A.*,
830 F.3d 1350 (Fed. Cir. 2016)......................................................................................5, 11, 12, 23

27

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016) ......................................................................................... *passim*

28

ii

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
    No. 13-cv-03999-BLF, 2015 WL 7351450 (N.D. Cal. Nov. 20, 2015)..........................................12

*Fleming v. Pickard*,
    581 F.3d 922 (9th Cir. 2009).................................................................................................6

*Genetic Techs. Ltd. v. Agilent Techs., Inc.*,
    24 F. Supp. 3d 922 (N.D. Cal. 2014) ..................................................................................8

*Hal Roach Studios, Inc. v. Richard Feiner & Co.*,
    896 F.2d 1542 (9th Cir. 1990)...................................................................................3, 6, 14

*Hewlett Packard Co. v. ServiceNow, Inc.*,
    No. 14-CV-00570-BLF, 2015 WL 1133244 (N.D. Cal. Mar. 10, 2015) ............................7

*Iconfind, Inc. v. Google, Inc.*,
    No. 2:11-CV-0319-GEB-JFM, 2012 WL 158366 (E.D. Cal. Jan. 18, 2012) ......................6

*Joao Bock Transaction Sys. v. Fid. Nat'l Info. Servs., Inc.*,
    122 F. Supp. 3d 1322 (M.D. Fla. 2015) ............................................................................13

*Kensu v. Buskirk*,
    No. 13-10279, 2015 WL 5317061 (E.D. Mich. Sept. 11, 2015)...................................14, 24

*Lumen View Tech. LLC v. Findthebest.com, Inc.*,
    984 F. Supp. 2d 189 (S.D.N.Y. 2013).................................................................................8

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
    132 S. Ct. 1289 (2012) .......................................................................................4, 20, 24

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
    837 F.3d 1299 (Fed. Cir. 2016).........................................................................................4, 5

*Mirror Worlds Techs., LLC v. Apple Inc.*,
    No. 6:13-CV-419, 2015 WL 6750306 (E.D. Tex. July 7, 2015) ......................................7

*Novo Transforma Techs., LLC v. Sprint Spectrum L.P.*,
    No. 14-612-RGA, 2015 WL 5156526 (D. Del. Sept. 2, 2015) ......................................13

*O'Reilly v. Morse*,
    56 U.S. 62 (1853) ...............................................................................................................4

*Potter Voice Techs., LLC v. Apple Inc.*,
    No. C 13-1710 CW, 2015 WL 5672598 (N.D. Cal. June 11, 2015)...............................15

*Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*,
    827 F.3d 1042 (Fed. Cir. 2016)................................................................................. *passim*

*Ronald A. Katz Tech. Licensing, L.P. v. Fedex Corp.*,
    No. 215-cv-02329-JPM, 2016 WL 1179218 (W.D. Tenn. Mar. 24, 2016) ....................15

iii

*Secured Structures, LLC v. Alarm Sec. Grp., LLC*,
    No. 6:14-CV-930, 2016 WL 1253688 (E.D. Tex. Mar. 10, 2016) ................................15

*Shafer v. Hill*,
    No. 3:08-CV-0395-GBH, 2008 WL 4367291 (N.D. Tex. Sept. 23, 2008)..............................14, 24

*In re TLI Commc'ns LLC Patent Litig.*,
    823 F.3d 607 (Fed. Cir. 2016)......................................................................................5

*Turner v. Cook*,
    362 F.3d 1219 (9th Cir. 2004)......................................................................................7

*Ultramercial, Inc. v. Hulu, LLC*,
    772 F.3d 709 (Fed. Cir. 2014)......................................................................................3

**Statutes**

35 U.S.C. § 101 ..................................................................................................... *passim*

35 U.S.C. § 112(6) ...............................................................................................2, 14, 15

**Other Authorities**

Manual of Patent Examining Procedure § 2106 (9th ed., Mar. 2014) ................................19

**Rules**

Fed. R. Civ. P 12(b)(6).................................................................................................14

Fed. R. Civ. P. 12(c)......................................................................................................6

iv

I.     INTRODUCTION AND FACTUAL BACKGROUND

In response to Fitbit's successful assertion of patent-ineligibility against four Jawbone patents at the ITC, Jawbone has now indiscriminately asserted that all nine Fitbit patents asserted against it are ineligible under Section 101.  In doing so, Jawbone attacks each patent in the same way: it strips the claims of their essential character to make them appear "abstract," asserts that the claims implement "conventional" technology without any support in the record and with little or no reference to the patents' specifications, and ignores claim construction and factual disputes underlying both steps of the *Mayo* analysis.  Put simply, Jawbone employs a shotgun approach to Section 101, with little respect for the law or the facts.

Here, Jawbone's lack of respect for the facts begins with the very first sentence of its brief. Jawbone makes much of Fitbit's assertion of patents against Jawbone in this and other cases, but nowhere does Jawbone confess that *it* actually started this fight by filing three lawsuits against Fitbit—and only after Jawbone filed those suits did Fitbit respond with its own claims.  Jawbone, moreover, fails to explain that its Section 101 witch hunt began after the ITC found that four Jawbone patents—unrelated to Fitbit's patents asserted here or in any forum—were ineligible.  Since that finding, Jawbone has taken the approach that all inventions related to portable activity monitoring devices—the devices that Fitbit sells and Jawbone used to sell—are patent-ineligible.  That is not the case and, as with any infringement, validity, or eligibility issue, the Court must review each patent and patent claim separately, on its own merit.

Jawbone's shotgun approach to Section 101 continues in the present motion.  As noted, Fitbit's patents relate to portable activity monitoring devices—small devices that monitor a user's physical activity, such as steps taken and calories expended.  Fitbit invests millions of dollars annually into improving the technology implemented in these devices, which requires addressing significant and specific technological obstacles.  Fitbit's patents describe and claim concrete combinations of hardware and software that overcome these technological challenges.  Construing the evidence in the light most favorable to Fitbit—*i.e.*, not accepting Jawbone's unsupported, highly abstracted, and self-serving characterizations of the claims—it is clear that the asserted claims are patent-eligible under both steps of the *Mayo* inquiry.

1

The asserted claims of U.S. Patent No. 8,909,543 ("the '543 patent") are directed to improved methods of recording and reporting a user's movement that use specific motion sensors and light emitting diodes to minimize the size and cost of manufacture of activity monitoring devices. The '543 patent does not, as Jawbone contends, simply cover "the basi[c] steps" of detecting movement, notifying a person of the amount of movement, and sending data about the movement (Jawbone Br. 9); the claims require specific structure to accomplish these tasks, which is sufficient to render the claims not abstract under recent Federal Circuit case law. Jawbone, in fact, undercuts its argument that the "motion detection" limitations are abstract and conventional by proposing as part of claim construction that "motion detection component" be construed under 35 U.S.C. § 112(6) to be limited to specific structures in the specification. Even if the claims are not subject to Section 112(6), the '543 patent is patent-eligible based on the specific structure required by the claims themselves.

The asserted claims of U.S. Patent No. 9,031,812 ("the '812 patent") are directed to an improved and specific notification system for activity monitoring devices. While, prior to the invention, portable activity monitoring devices could provide notifications to users regarding their activity, those systems were ineffective because notifications were often provided to the user when he or she could not view or respond to them, such as when a user was exercising or sleeping. To address this issue, the '812 patent teaches an improved system that receives activity data from the portable activity monitoring device, creates a measureable activity metric from the raw activity data, and, when the activity metric reaches a threshold, schedules a notification message to the user at a time the user will be able to view and interact with the message. Because the claims, supported by the specification, embody technological solutions to problems in the art, the claims are not directed to an abstract idea. And, even if they were, the claims provide an "inventive concept"—the improved notification system—that transforms them into something more. Notably, here, during prosecution, the patent examiner specifically considered the eligibility of the claims under Section 101 and found that the claims were eligible. Jawbone presents no evidence that the examiner is wrong; Jawbone simply disagrees with the examiner's conclusion. But Jawbone cannot scrub evidence it disagrees with from the intrinsic record, especially at this stage where the evidence must be viewed in the light most favorable to Fitbit.

The asserted claims of U.S. Patent No. 9,042,971 ("the '971 patent") are also patent-eligible. In its scant two pages of argument, Jawbone presents no evidence on which this Court can find to the contrary.  The inventors of the '971 patent, to resolve issues with limited battery life in small, portable activity monitoring devices with power-hungry heart rate monitors, devised an innovative system to collect heart rate data at only limited times.  To do so, the patent describes and claims a device with a specific component—an "activator"—that responds to a single user-gesture to trigger an on-demand heart rate measurement.  Measuring heart rate in response to a single user-gesture, rather than all the time, acts as a power-saving measure for the power-hungry heart rate monitor and is anything but abstract under step one of the *Mayo* inquiry.  The addition of this unconventional component similarly demonstrates eligibility at step two of the inquiry.

At bottom, Jawbone's motion is devoid of any evidence to "clearly establish[]" that it is entitled to judgment as a matter of law—a tall order given the limited record at this stage of the case. *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1550 (9th Cir. 1990).  Jawbone ignores the concrete, technological and innovative improvements described and claimed in Fitbit's patents, ignores the patent examiner's consideration of Section 101, and replaces that, and other, evidence with unsupported attorney argument.  Below, Fitbit provides evidence (including from an expert in the field) to demonstrate the error in these assertions, highlighting the inappropriateness of a judgment on the pleadings.  For these, and the other reasons set forth herein, Fitbit respectfully requests that the Court deny Jawbone's motion.

## II.    LEGAL STANDARDS

### A.    Patent Eligibility Under Section 101

Under Section 101, a patent may be obtained for "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof."   35 U.S.C. § 101.  The exceptions are when the claims of the patent are directed to "[l]aws of nature, natural phenomena, and abstract ideas." *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 714 (Fed. Cir. 2014). The concern driving the "abstract idea" exceptions is one of preemption, or preventing "a monopoly over an abstract idea." *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (quoting *Bilski v. Kappos*, 561 U.S. 593, 611–12 (2010)).  In particular, "[t]he abstract idea exception prevents

patenting a result where 'it matters not by what process or machinery the result is accomplished.'" *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1312 (Fed. Cir. 2016) (citing *O'Reilly v. Morse*, 56 U.S. 62, 113 (1853)).

The Supreme Court has cautioned, however, to "tread carefully in construing this exclusionary principle lest it swallow all of patent law." *Alice*, 134 S. Ct. at 2354 (citing *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293–94 (2012)).   Indeed, an invention "is not rendered ineligible for patent simply because it involves an abstract concept" because, "[a]t some level, all inventions embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas."   *Id.* (internal quotations omitted).   Thus, courts must "distinguish between patents that claim the 'buildin[g] block[s]' of human ingenuity and those that integrate the building blocks into something more, thereby 'transform[ing]' them into a patent-eligible invention."   *Id.* (quoting *Mayo*, 132 S. Ct. at 1294, 1303) (citations omitted).   Fitbit's patents describe and claim the latter—they integrate technological building blocks into something more and something patent-eligible.

Courts apply a two-step analysis laid out in *Mayo* and *Alice* to determine whether claims are directed to ineligible subject matter.   A court must find that the claims fail *both* steps before declaring them ineligible.   Under step one, the court must "determine whether the claims at issue are *directed to* a patent-ineligible concept," such as an abstract idea.   *Id.* at 2355 (emphasis added).   If the answer is "no," then the inquiry ends and the claims are patent-eligible.   *Id.*   If the answer is "yes," then the court must "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application," or, in other words, whether the claims contain an "inventive concept."   *Id.*

**1.   Step One:  Whether Claims Are "Directed to" a Patent-Ineligible Concept**

The Federal Circuit has recently reiterated that the step one "directed to" inquiry is a "meaningful" one.   *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016).   This inquiry focuses not on "whether the claims *involve* a patent-ineligible concept, because essentially every routinely patent-eligible claim involving physical products and actions *involves* a law of nature and/or natural phenomenon," but rather on whether the "character [of the claims] as a whole is

4

*directed to* excluded subject matter." *Id.* (emphases added) (internal quotation marks omitted).  That is, "it is not enough to merely identify a patent-ineligible concept underlying the claim; [the court] must determine whether that patent-ineligible concept is what the claim is 'directed to.'" *Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.* ("*CellzDirect*"), 827 F.3d 1042, 1050 (Fed. Cir. 2016).  The Federal Circuit has further cautioned, when considering step one, not to "describ[e] the claims at such a high level of abstraction and untethered from the language of the claims [because doing so] all but ensures that the exceptions to § 101 swallow the rule."  *Enfish*, 822 F.3d at 1337.  The court has also cautioned "that courts 'must be careful to avoid oversimplifying the claims' by looking at them generally and failing to account for the specific requirements of the claims."  *McRO*, 837 F.3d at 1313 (quoting *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016)).

Where computer technology is involved, it is "relevant to ask whether the claims are directed to an *improvement* to computer functionality versus being directed to an abstract idea."  *Enfish*, 822 F.3d at 1335 (emphasis added).  Accordingly, where "the focus of the claims is on the specific asserted *improvement* in computer capabilities," rather than "on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool," the claims will pass *Mayo* step one and be held patent-eligible.  *Id.* at 1335–36 (emphasis added).  The Federal Circuit has similarly found that a claim that provides a "new and improved technique" that produces "tangible and useful result[s] falls squarely outside those categories of inventions that are 'directed to' patent-ineligible concepts," and thus are patent-eligible at step one.  *CellzDirect*, 827 F.3d at 1050; *see also Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016) (holding that claims that focus "on a specific improvement . . . in how computers could carry out one of their basic functions" are patent-eligible).  As explained below, Fitbit's patents disclose improvements in the capabilities of portable activity monitoring devices that are tied to a specific combination of components, and thus are not directed to an abstract idea.

### 2.  Step Two:  Whether the Claims Contain an "Inventive Concept"

If, and only if, a court determines that the claims *as a whole* are "directed to" an abstract idea, then the court proceeds to step two, which is a "search for an 'inventive concept.'"  *Alice*, 134 S. Ct. at 2355.  Under step two, the court considers "the elements of each claim both individually and 'as an

5

ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* In other words, the court must determine whether the entirety of the claim amounts to a "patent upon the [ineligible concept] itself," or whether the claim covers a "patent-eligible application" of the ineligible concept. *Id.* The Federal Circuit has clarified, however, that "[t]he inventive concept inquiry requires more than recognizing that each element, by itself, was known in the art." *Bascom Global Internet Servs., Inc. v. AT&T Mobility, LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016). Indeed, "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *Id.*

With respect to computer technology, an inventive concept will exist in claims that "recite a specific, discrete implementation of [an] abstract idea," where the "particular arrangement of elements is a technical improvement over prior art [methods]." *Id.* at 1350. In other words, claims directed to "a technology-based solution (not an abstract-idea-based solution implemented with generic technical components in a conventional way) to . . . overcome[] existing problems [in the art]" are patent-eligible under step two. *Id.* at 1350–51 (finding that claims covering a "specific method of filtering Internet content" were patent-eligible); *see also DDR Holdings, LLC v. Hotels.com L.P.*, 773 F.3d 1245, 1257, 1259 (Fed. Cir. 2014) (holding that claims "amount[ing] to an inventive concept for resolving [a] particular Internet-centric problem" were patent-eligible). To the extent Fitbits patents are found to be directed to abstract ideas, the patents disclose specific, non-conventional, and non-generic arrangements of components to implement the ideas underlying the claims, and are thus patent-eligible under *Mayo* step two.

### B.    Judgment on the Pleadings Under Rule 12(c)

A party moving for judgment under Federal Rule of Civil Procedure 12(c) must "clearly establish[] that no material issue[s] of fact remain[] and that it is entitled to judgment as a matter of law." *Hal Roach*, 896 F.2d at 1550; *see also Iconfind, Inc. v. Google, Inc.*, No. 2:11-CV-0319-GEB-JFM, 2012 WL 158366, at *3 (E.D. Cal. Jan. 18, 2012) (finding that challenger "has not shown under the applicable 'clearly established' standard of Rule 12(c)" that the asserted claims were not directed to eligible subject matter). The court must accept "all factual allegations in the complaint as true and construe them in the light most favorable to the non-moving party." *Fleming v. Pickard*, 581 F.3d

---

6

922, 925 (9th Cir. 2009) (citing *Turner v. Cook*, 362 F.3d 1219, 1225 (9th Cir. 2004)).  In regards to challenges under Section 101, this Court has found that because "patents are presumed valid . . . an alleged infringer asserting an invalidity defense bears the burden of proving invalidity by clear and convincing evidence."  *Hewlett Packard Co. v. ServiceNow, Inc.*, No. 14-CV-00570-BLF, 2015 WL 1133244, at *5 (N.D. Cal. Mar. 10, 2015).[1]

Although patent-eligibility under Section 101 is decided as a matter of law, the Federal Circuit has recognized that "[t]his legal conclusion may contain underlying factual issues."  *Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1340–41 (Fed. Cir. 2013); *Arrhythmia Research Tech., Inc. v. Corazonix Corp.*, 958 F.2d 1053, 1055–56 (Fed. Cir. 1992) ("[D]etermination of [the Section 101] question may require findings of underlying facts specific to the particular subject matter and its mode of claiming . . . .").  As such, while some courts have dismissed patent infringement claims on the pleadings, given the "limited record" at this stage of the proceedings, early dismissal is premature when the factual record lacks certainty.[2]  For example, in *Bascom*, the Federal Circuit reversed the district court's finding on a Rule 12(b)(6) motion that the claims were directed to ineligible subject matter under Section 101.  *See* 827 F.3d at 1350 ("On this limited record, this specific method of filtering Internet content cannot be said, as a matter of law, to have been conventional or generic."); *see also Cave Consulting Grp., Inc. v. Truven Health Analytics Inc.*, No. 15-CV-02177-SI, 2016 WL 283478, at *3 (N.D. Cal. Jan. 25, 2016) (denying motion for judgment on the pleadings until there is a "fuller factual record"); *Mirror Worlds Techs., LLC v. Apple Inc.*, No. 6:13-CV-419, 2015 WL 6750306, at *10 (E.D. Tex. July 7, 2015) ("However, the Court cannot conclude at the pleading stage that claim 13 uses conventional and generic computer functions

---

[1]  Addressing the issue of burden is not necessary here, however, as Jawbone failed to show that the asserted claims are not directed to eligible subject matter under either standard.

[2]  Fitbit moved for judgment on the pleadings that three of Jawbone's asserted patents were ineligible under Section 101 in *Jawbone v. Fitbit*, No. 3:15-cv-2579 (N.D. Cal.), because the issue was ripe for decision.  The intrinsic record with respect to those three patents provided sufficient evidence for the court to rule on the issue—including specific statements regarding the conventionality of the claims.  The ITC's determination of ineligibility as to Jawbone's patents confirms this point, which determination the ITC made based on argument that largely mirrored the motion filed in the Northern District of California.  This stands in sharp contrast to Jawbone's use of Section 101 against Fitbit's patents asserted in the ITC; there, for two of the three asserted patents, the Commission found the evidence had not been properly weighed, vacated the ALJ's decision of ineligibility, and remanded the case back to the ALJ.

7

to disproportionately preempt the abstract idea."); *Genetic Techs. Ltd. v. Agilent Techs., Inc.*, 24 F. Supp. 3d 922, 929 n.6 (N.D. Cal. 2014) ("[I]t will be rare that a patent infringement suit can be dismissed at the pleading stage for lack of patentable subject matter.") (quoting *Lumen View Tech. LLC v. Findthebest.com, Inc.*, 984 F. Supp. 2d 189, 204 (S.D.N.Y. 2013)).

Although Fitbit believes that the asserted claims are patent-eligible, at a minimum, as in the above cases, there is no basis to conclude on the limited record here that the asserted claims are ineligible.  Indeed, the Commission's recent decision vacating the ALJ's summary determination on patent-eligibility because "the parties dispute what was conventional at the time of the invention" demonstrates that there are factual issues to be resolved related to this technology and that this case (like those cited above) is not suited for disposition on a Rule 12 motion.  *See* Ex. B at 2.

## III.    ARGUMENT

### A.    The '543 Patent Is Directed to Eligible Subject Matter

The asserted claims of the '543 patent are directed to improved devices and methods for recording and reporting a user's movement.  The devices do so by using concrete and specific motion sensors and light emitting diodes, which address challenging design constraints for portable activity monitoring devices.  *See Enfish*, 822 F.3d at 1337 (finding claims directed to eligible subject matter where they are "directed to an improvement of an existing technology").  Because the improved method of the asserted claims "is tied to a specific structure of various components," it is not abstract under step one of the *Mayo* inquiry.  *AMDOCS (ISRAEL) Ltd. v. Openet Telecom, Inc.*, --- F.3d ----, 2016 WL 6440387, at *10 (Fed Cir. Nov. 1, 2016).  Moreover, because the claims disclose a specific and unique architecture that accomplishes these improvements—and Jawbone presents no evidence to the contrary—the claims contain the requisite "something more" to prevent the monopolization of any abstract ideas under step two of the inquiry.  *Id.* at *11.

#### 1.    The '543 Patent Is Directed to a Specific Structure that Improves Portable Activity Monitoring Technology

The industry for portable activity monitoring devices, while still a relatively new and growing industry today, was absolutely infant at the time of the '543 patent's invention.[3]  *See* Ex. A (van der

---

[3]  The '543 patent claims priority to three provisional applications, filed September 26, 2006, September 26, 2007, and January 24, 2008.

Weide Decl.), ¶ 6.  The inventors recognized that portable activity monitoring devices could be used to combat obesity, which "ha[d] reached epidemic proportions in the United States, as well as worldwide," by "encouraging physical activity." '543 patent at 1:34, 44–45.  "The real challenge," according to the inventors, "is motivating individuals to participate in an exercise regimen or physical activity." *Id.* at 2:12–13.  To this end, the inventors sought to develop devices and systems "to encourage, motivate, or promote additional physical activity or exercise." *Id.* at 2:31–33.

While simple pedometers had long existed, it was recognized that more advanced devices could better elevate users from exercise apathy.  Ex. A (van der Weide Decl.), ¶ 6.  Those skilled in the art, however, faced significant technological obstacles in implementing that recognition.  *Id.* ¶ 7.  Devices had to be small, simple, and cost-effective, yet able to withstand repeated, everyday use.  *Id.* The '543 patent explains that "[i]t is advantageous to minimize the cost of manufacture and overall size when designing the components for monitoring the extent of participation in physical activity or movement by the user." '543 patent at 11:52–55.  Due to technological limitations at the time, for many devices this militated against advanced liquid crystal displays (LCDs), which were large, expensive, power hungry, and prone to break.  Ex. A (van der Weide Decl.), ¶ 7.  Devices also required an accurate but cost-effective sensor for detecting and recording movement.  *Id.*

To overcome these technological obstacles, the '543 patent claims a method of operating a portable activity monitoring device with specific structural components in a flexible band: a "motion detection component" and a "series of light emitting diodes" (LEDs).  '543 patent at 26:46–49 (claim 20).  With respect to the "motion detection component," the specification provides several distinct examples, including describing the physical aspects of several actual motion sensors that could be used to achieve the goals of the '543 patent.  *See id.* at 3:5–9; *see also generally id.* at 11:42–20:57 & Figs. 3A–5, 7A–18B; Ex. A (van der Weide Decl.), ¶ 8.  With respect to the series of LEDs, the claims explain that the series of LEDs illuminates "in a progression from one end of the series . . . toward another end . . . based on an amount of movement of the person recorded using the motion detection component." '543 patent at 26:52–59.  This allows the device to "provide signals to a user" without an expensive, fragile, or power intensive graphical display (such as an LCD), thus satisfying the rigid design criteria of the time.  *Id.* at 19:34–35; Ex. A (van der Weide Decl.), ¶ 8.

9

The dependent claims here are not represented by the independent claims, and Jawbone has not presented independent arguments regarding the dependent claims. The dependent claims provide additional limitations on the structure of a portable activity monitoring device. Dependent claim 29, for example, specifies that "the motion detection component and the series of light emitting diodes are removable from the band." '543 patent at 28:7–9. This allows the "removable" component to be inserted into various wearable objects—such as "a bracelet, anklet, necklace, headband, hat, scarf, glove, clothing, footwear, pin, clip, eyewear, belt and neckwear"—and still detect and report movement, thus further promoting physical activity. *Id.* at 7:21–26.

### 2.     Step One:  The '543 Patent Is Not Directed to an Abstract Idea

Jawbone's assertion that the claims of the '543 patent merely cover the steps of "detecting and tracking a user's activity" and "notifying the user of the amount of activity the device has detected" (Jawbone Br. 10)—and are therefore directed to an abstract idea—runs far afoul of *Enfish*. In so asserting, Jawbone presents a self-fulfilling contention: it presents a highly abstracted expression of the patents and then argues that such expression is an abstract idea. By constructing its argument in this way, no invention would be patent-eligible; indeed, the first patent on a lightbulb is simply directed to the abstract idea of "providing light." But Jawbone's arguments here—like a hypothetical ineligibility attack on the lightbulb—ignore the core structure included in the claims, the concrete technological improvements at the heart of the claims, and the purposes and benefits of the invention described in the specification.

In *Enfish*, the Federal Circuit clarified that the first step of the inquiry "cannot simply ask whether the claims *involve* a patent-ineligible concept" but, rather, "the 'directed to' inquiry applies a stage-one filter to claims, considered in light of the specification, based on whether 'their character as a whole is directed to excluded subject matter.'" 822 F.3d at 1335. While the '543 patent's claims *involve* information gathering, processing, and displaying, they are *directed to* the specific structure to accomplish those tasks, which overcomes technological limitations in portable activity monitoring devices at the time. *See supra* Section III.A.1. Thus, "the plain focus" of the '543 patent claims "is on an improvement to [portable activity monitoring device] functionality itself, not on economic or other tasks for which a computer is used in its ordinary capacity." *Enfish*, 822 F.3d at 1336.

Jawbone attempts to support its "abstract" argument by employing the process of "compar[ing] claims at issue to those claims already found to be directed to an abstract idea in previous cases," which has been endorsed by both the Supreme Court and Federal Circuit for the first step of the *Mayo* inquiry. *Enfish*, 822 F.3d at 1334. But in its effort to make the '543 patent claims appear analogous to the claims found abstract in cases like *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1351 (Fed. Cir. 2014), and *Electric Power*, Jawbone improperly strips the '543 patent claims of their core structure. Jawbone does so out of recognition that the Federal Circuit found the claims in those cases abstract precisely because those claims failed to tie the claimed process to any particular structure or machine. A comparison of the '543 patent claims to the claims addressed in those cases highlights the defects in Jawbone's attempted comparison.

First, in *Digitech*, the Federal Circuit considered the eligibility of a claim directed to a process of "generating a device profile that describes properties of a device in a digital image reproduction system." 758 F.3d at 1351. The court found this claim directed to an abstract idea "because it describes a process of organizing information through mathematical correlations *and is not tied to a specific structure or machine*." *Id.* at 1350 (emphasis added). The court elaborated that the claim "recites an ineligible abstract process of gathering and combining data *that does not require input from a physical device*." *Id.* at 1351 (emphasis added). The asserted claims of the '543 patent, in contrast to the claim in *Digitech*, require input from a specific, physical device: the claimed band with the motion detection component depicted in dozens of figures and described in nearly ten columns of the specification. Moreover, the method of receiving, organizing, and displaying information in the '543 patent is "tied to a specific structure or machine": the claimed band with both the motion detection component and series of LEDs that illuminates in a progression. *Id.* at 1350.

More recently, in *Electric Power*, the Federal Circuit confirmed that claims covering a process of collecting and analyzing information that "identif[ies] a particular tool for presentation" would be patent-eligible. 830 F.3d at 1354. In *Electric Power*, the Federal Circuit considered the eligibility of claims directed to "performing real-time performance monitoring of an electric grid by collecting data from multiple sources, analyzing the data, and displaying the results." *Id.* at 1351. The court held that, without more, the processes of "collecting information," "analyzing information by steps

11

people go through in their minds," and "presenting the results" were abstract and patent-ineligible. *Id.* at 1353–54.  The court explained, however, that *with* more—such as "identifying a particular tool for presentation"—those processes could be patent-eligible.  *See id.* at 1354.  This is where the '543 patent claims lie.  The claims do not simply recite receiving and displaying data generically; they identify "particular tools" for both collecting data (the motion detection component) and presenting the results (the series of LEDs that illuminates in a progression).

The USPTO recently issued guidance for its examiners on subject matter eligibility based on recent Federal Circuit decisions, including *Electric Power*.  *See* Ex. C (USPTO Memorandum).  In its memorandum, the USPTO counseled its examiners that "[a]n indication that a claim is directed to an improvement in computer-related technology may include . . . a particular solution to a problem or a *particular way* to achieve a desired outcome defined by the claimed invention, as opposed to merely claiming the idea of a solution or outcome."  *Id.* at 2–3 (emphasis added).  The USPTO contrasted such "particular way[s] to achieve a desired outcome" with the claimed method in *Electric Power*, which "was directed to an abstract idea because it merely presented the results of collecting and analyzing information, without even identifying a particular tool for the presentation."  *Id.* at 3.  Here, as explained, the claims define a "particular way" of collecting and displaying data with the motion detecting component and series of LEDs—the "particular tool[s]" deficient in *Electric Power*.[4]

Most recently, in both *Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1258 (Fed. Cir. 2016), and *AMDOCS*, 2016 WL 6440387, at *10, the Federal Circuit confirmed the importance of specific structure in finding claims not to be abstract.  In *Affinity Labs*, the court held that a "broad and familiar concept" that is "untethered to any specific or concrete way of implementing it" is patent-ineligible.  838 F.3d at 1258.  Similarly, in *AMDOCS*, the court endorsed claims "tied to a specific structure of various components."  2016 WL 6440387, at *10.  The present claims, which tether the process of tracking and reporting user activity data to a specific and concrete structure of

---

[4]  While "the Patent Office's guidance is not binding," this Court "finds its reasoning persuasive." *Finjan, Inc. v. Blue Coat Sys., Inc.*, No. 13-cv-03999-BLF, 2015 WL 7351450, at *9 (N.D. Cal. Nov. 20, 2015).

components, *see supra* Section III.A.1, are therefore not directed to an abstract idea under the Federal Circuit's most recent Section 101 precedent.[5]

### 3.    Step Two:  The '543 Patent Contains an Inventive Concept

Because the asserted claims pass step one of the *Mayo* inquiry, an analysis under the second step is not necessary.  The claims also pass *Mayo* step two because they recite an "inventive concept" that provides "significantly more" than an abstract idea and transform this idea into a patent-eligible application.  *Alice*, 134 S. Ct. at 2357–58.

Here, the "ordered combination" of claim elements covers "significantly more" than simply tracking and reporting movement.  As in *Bascom*, the claims require much more than "an instruction to implement or apply [the processes of tracking and reporting movement] on a [portable activity monitoring devices]."  827 F.3d at 1349.  Rather, the claims are directed to a "specific, discrete implementation" of these processes on an activity monitoring device requiring a specific motion detecting component and a series of LEDs.  *Id.* at 1350; *see also* Ex. A (van der Weide Decl.), ¶¶ 8–9.  Jawbone identifies no evidence that, in the context in which they appear—portable activity monitoring technology—the claimed components, as specifically arranged, are conventional.  Indeed, as the cases make clear, the use of known components alone does not render an invention "conventional."  *See Bascom*, 827 F.3d at 1350 ("[A]n inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces.").  After all, most, if not all, inventions arise from earlier technological innovations; Edison's light bulb, for example, was nothing more than a thin wire in a sealed glass.

---

[5]  The district court cases Jawbone cites do not alter this conclusion.  *See* Jawbone Br. 10–11.  None of the claims at issue in those cases contained the specific and concrete structure of the '543 patent claims.  For example, the claims at issue in *Joao Bock Transaction Systems* recited a generic "receiver," "processor," and "transmitter," and the patent at issue did not describe the physical structure of such components to the level of detail in the '543 patent.  *See Joao Bock Transaction Sys. v. Fid. Nat'l Info. Servs., Inc.*, 122 F. Supp. 3d 1322, 1331, 1335 (M.D. Fla. 2015); *see also Eclipse IP LLC v. McKinley Equip. Corp.*, No. SACV 14-154-GW, 2014 WL 4407592, *6 (C.D. Cal. Sept. 4, 2014) (claiming "initiating a notification communication" and "receiving a response" without specifying hardware involved in communication); *Novo Transforma Techs., LLC v. Sprint Spectrum L.P.*, No. 14-612-RGA, 2015 WL 5156526, at *1 (D. Del. Sept. 2, 2015) (reciting "automatically notifying" without specifying hardware providing notification).

The asserted claims here also cover an inventive concept under the Federal Circuit's holdings in *DDR Holdings* and *CellzDirect* because they "improve[] an existing technological process." *CellzDirect*, 827 F.3d at 1050.  As explained above, the claims of the '543 patent represent a novel optimization of the processes of tracking and reporting movement given the strict design constraints at the time.  *See supra* Section III.A.1; *DDR Holdings*, 773 F.3d at 1257–59 (holding that claims "amount[ing] to an inventive concept for resolving [a] particular Internet-centric problem" were patent-eligible).  Jawbone ignores this element of the analysis.

Lacking any evidence on step two of the inquiry, Jawbone parades attorney argument regarding what is "conventional."  *See* Jawbone Br. 12–13.  Jawbone concludes, for example, that "the elements of the independent claims and the dependent claims, considered as an ordered combination, also do not add an inventive concept to the claimed subject matter."  *Id.* at 13.  But Jawbone cites no supporting evidence at all.  Jawbone thus falls far short of "clearly establishing" that there are no material issues of fact.  *See Hal Roach*, 896 F.2d at 1550.  District courts routinely find that unsupported attorney argument is insufficient to support a motion to dismiss at this early stage.  *Kensu v. Buskirk*, No. 13-10279, 2015 WL 5317061, at *2 (E.D. Mich. Sept. 11, 2015) ("Defendants cannot succeed on a Motion for Judgment on the Pleadings by making unsupported arguments that factually contradict the Plaintiff."); *Shafer v. Hill*, No. 3:08-CV-0395-GBH, 2008 WL 4367291, at *6 (N.D. Tex. Sept. 23, 2008) ("Defendant's unsupported argument provides no valid basis for dismissing any claim under Rule 12(b)(6)."); *Allen v. Cypress Vill., LTD.*, No. 3:10-CV-994-WKW, 2011 WL 2559614, at *2 (M.D. Ala. June 27, 2011) ("Defendants' cursory and unsupported argument is reason enough to deny the motion to dismiss.").

Given the dispute of material fact regarding the improvements achieved by the asserted claims and the conventionality of the claims, judgment on the pleadings is inappropriate.

### 4.    Jawbone's Claim Construction Arguments Undercut its Arguments

Jawbone's claim construction positions fatally undercut its present argument that the claims are abstract, generic, and conventional.  In particular, Jawbone contends that the claim term "motion detection component" should be construed under Section 112(6) and limited to "[t]he corresponding structures that perform [the] function" of "detecting and recording movement of the person."  Ex. D

14

at 2. Jawbone identifies over a dozen figures and around ten columns of text as describing the "corresponding structures," which underscore the specific, concrete (*i.e.*, non-abstract) nature of the claims. *Id.* But here, consistent with its effort to ignore what the '543 patent actually discloses, Jawbone disregards these specific and detailed structures that clearly demonstrate the concrete—as opposed to abstract—character of the invention. While Fitbit disagrees that Section 112(6) governs this term, to the extent this Court believes there is a question regarding Section 112(6) here, courts often deny motions for ineligibility under Section 101 where Section 112(6) applies. *See, e.g.*, *Potter Voice Techs., LLC v. Apple Inc.*, No. C 13-1710 CW, 2015 WL 5672598, at *5 (N.D. Cal. June 11, 2015) (finding that a claim governed by Section 112(6) was not ineligible because it "may involve an inventive concept of content determination when described and limited by the relevant language in the specification"); *Ronald A. Katz Tech. Licensing, L.P. v. Fedex Corp.*, No. 215-cv-02329-JPM, 2016 WL 1179218, at *8 (W.D. Tenn. Mar. 24, 2016) (finding claims patent-eligible where "the record testing structure [governed by Section 112(6)] is not a conventional processor because it is specialized and its components limit and define the system that is claimed").

Ultimately, the dispute over the meaning of the term "motion detection component" confirms that it is premature for this Court to assess the eligibility of the claims. *See Secured Structures, LLC v. Alarm Sec. Grp., LLC*, No. 6:14-CV-930, 2016 WL 1253688, at *5 (E.D. Tex. Mar. 10, 2016) ("Defendants . . . assert[] that the disputed term is subject to § 112(6) and is indefinite for failing to disclose sufficient corresponding structure. The dispute on the proper construction of this term, drawing all inferences in favor of the plaintiff, shows that construction of the term will benefit the Court in its analysis of subject matter eligibility."). The Court should therefore deny Jawbone's motion with respect to the '543 patent.

## B.     The '812 Patent Is Directed to Eligible Subject Matter

The '812 patent provides a concrete solution to a problem in the field of portable activity monitoring devices: how to notify users of their progress toward a goal at a time when the user is able to view and interact with the notification. Thus, the asserted claims of the '812 patent focus on a notification system that, when the user's activity reaches a particular threshold, schedules a notification message at a time the user will be able to view and comprehend the notification. *See*

---

15

*Enfish*, 822 F.3d at 1335–38 (finding "claims, considered in light of the specification," directed to eligible subject matter where "the focus of the claims is on the specific asserted improvement in computer capabilities").   The intrinsic evidence—which Jawbone dismisses with no more than the *ipse dixit* of its attorneys—establishes that the solution in the '812 patent contains "unconventional steps that confine the claim to a particular useful application."   Jawbone Ex. 11 at 2.   Jawbone's summary dismissal of this evidence is a far cry from construing it in a light most favorable to Fitbit. The claims thus satisfy Section 101 under both steps of the *Mayo* analysis.

### 1.   The '812 Patent Is Directed to a Specific, Improved Notification System for Portable Activity Monitoring Devices

The '812 patent is directed to "systems, apparatus, computer readable media, and methods for presenting notifications on a user device based on user activity."   '812 patent at 1:48–51.   The '812 patent describes a system that compares a user's activity to a predefined threshold or "goal[] for the user to attain," and triggers a notification when that goal is reached.   *Id.* at 9:57–10:5. Notifications not seen, naturally, are ineffective.   As the '812 patent recognizes, "there can be many instances when the user is unlikely to be able to view or comprehend the notification, or when it is otherwise undesirable to provide a notification to the user, even though a notification threshold has been reached."   *Id.* at 13:5–9.   By way of example, the user may be "busy or occupied during a specific time period" or could be "currently engaged in physical activity [and] therefore unavailable to receive a notification."   *Id.* at 13:9–16.   Or, he or she may simply be sleeping.   *See id.* at 12:50–54.

The '812 patent thus discloses and claims a novel notification system for portable activity monitoring devices that, based on data received by the device, schedules a notification for a time the user will be able to view and comprehend it.   *See id.* at 12:29–13:4.   The specification of the '812 patent describes a "notification scheduler" that, when it is determined that it is not an appropriate time to send a notification, "receives the relevant information defining the notification, and schedules the rendering of the notification on the mobile device 512 for a later time."   *Id.* at 12:55–59.   The scheduler can, for example, "schedule the notification for rendering during a specified time window or period of time."   *Id.* at 12:59–62.   In addition to scheduling notifications, the notification system of the '812 patent presents notifications that "provid[e] access to an application for interfacing with the

16

activity monitoring device." *Id.* at 25:40–42.  This allows the user to stay apprised of his or her progress.

These advances are reflected in the asserted independent claims of the '812 patent.  The dependent claims—which are not represented by the independent claims and which Jawbone does not address individually—cover additional aspects of the notification system.

### 2. Step One:  The '812 Patent Is Not Directed to an Abstract Idea

The claims of the '812 patent are not directed to an abstract idea because their "focus . . . is on the specific asserted improvement in [portable activity monitoring device] capabilities"—*i.e.*, an improved notification system for scheduling alerts when a user can view them.  *Enfish*, 822 F.3d at 1336.  As it has done in all of its arguments, Jawbone improperly ignores these improvements to present the claims as merely covering "generic processes."  *See* Jawbone Br. 14.

Additionally, Jawbone fails to consider the claims' "character *as a whole*" as required by *Enfish*.  822 F.3d at 1335 (emphasis added).  This infects Jawbone's entire "directed to" analysis under step one of the inquiry.  As a whole, the claims of the '812 patent are about much more than the "generic processes" of transferring data, tracking activity, and generating notification messages.  *See* Jawbone Br. 13–15.  To the contrary, as explained above, the '812 patent is directed to improving the functionality and usefulness of portable activity monitoring devices.  *See supra* Section III.B.1. Ignoring the claims and specification, and, again, without any supporting evidence or explanation, Jawbone simply denies this.  Jawbone asserts, for example, that "[t]he claims in the '812 patent do not describe any way of improving the generic processes of gathering activity data and giving the user a notification about that data."  Jawbone Br. 14.  This is untrue.  As explained above and in the specification of the '812 patent, the improvement described and claimed in the patent is to provide notifications to users at a time when the user is able to view the notification, and further allowing the user to interact with the notification.  *See* Ex. A (van der Weide Decl.), ¶¶ 11–12.  These improvements addressed issues in the prior art with users receiving notifications but being unable to view or interact with them.  In other words, as in *Enfish*, the '812 patent claims "a specific implementation of a solution to a problem in the [portable monitoring device] arts."  *Enfish*, 822 F.3d at 1339; *see also CellzDirect*, 827 F.3d at 1048 ("This type of constructive process carried out by an

artisan to achieve 'a new and useful end,' is precisely the type of claim that is eligible for patenting.").

Jawbone's conclusion that the claims are directed to an abstract idea—based on an incomplete view of the claims—must be rejected.

### 3. Step Two: The Asserted Claims of the '812 Patent Contain an Inventive Concept

Because the asserted claims of the '812 patent are not directed to an abstract idea, there is no need to proceed to step two of the *Mayo* inquiry. However, even in view of Jawbone's argument that the '812 patent is directed to an abstract idea (it is not), the intrinsic evidence—specifically, the examiner's considered assessment of eligibility under Section 101—shows that the '812 patent contains an "inventive concept" that "transform[s] the nature of the claim[s] into [] patent-eligible application[s]." *See Alice*, 134 S. Ct. at 2355 (internal quotation marks omitted).

During prosecution of the '812 patent, the examiner rejected the then-pending claims under Section 101 "because the claim(s) as a whole, considering all claim elements both individually and in combination, do not amount to significantly more than an abstract idea."  Jawbone Ex. 9 at 2.  In response, Fitbit amended the independent claims to add the limitation "wherein the notification message is displayed on the mobile device at the specified date and time, the display of the notification message providing access to an application for interfacing with the activity monitoring device."  *See* Jawbone Ex. 10 at 2.  In response, the examiner withdrew the ineligibility rejection because the claims, viewed as a whole, were sufficient under step two of the *Mayo* inquiry.

> Applicant's amendments . . . are sufficient to overcome the rejections under 35 U.S.C. § 101 because *the limitations add "significantly more" to the claim*.  By itself, displaying a message may be considered insignificant extra-solution activity, however, *displaying a notification message on a mobile device at a specified time and date* where the notification message provides access to an application for interfacing with an activity monitoring device where a wireless connection exists between the mobile device and the activity monitoring device is not insignificant.  Applicant has added unconventional steps that confine the claim to a particular useful application.

Jawbone Ex. 11 at 2 (emphases added).  In other words, the examiner considered and rejected the argument Jawbone now presents because the '812 patent—through the claimed notification system—contains an "inventive concept."  *See CellzDirect*, 827 F.3d at 1051 (vacating summary judgment on

18

patent-ineligibility and finding the claimed process "far from routine and conventional" by relying on statements from the examiner during prosecution of the asserted patent).

Jawbone's treatment—or lack thereof—of this evidence exposes fatal flaws in Jawbone's Section 101 attack. First, it illustrates the indiscriminate and generic approach Jawbone has taken in its Section 101-based attacks on Fitbit's patents. Indeed, rather than address substance, Jawbone simply disagrees with the examiner's allowance. Second, it demonstrates how Jawbone fails to, as it must, address the evidence in a light most favorable to Fitbit, thereby highlighting the inappropriateness of a judgment on the pleadings based on the present record. *See Cronos Techs., LLC v. Expedia, Inc.*, No. CV 13-1538-LPS, 2015 WL 5234040, at *3 (D. Del. Sept. 8, 2015) ("The briefing and evidence now before the Court are not adequate to permit a definitive answer to the[] questions [of preemption and patentability] at this stage."). Drawing all reasonable inferences in favor of Fitbit, the examiner's conclusions during prosecution should—and do—dispose of Jawbone's argument that the claims are routine and conventional. Instead of presenting any contrary evidence, Jawbone essentially asks this Court to set aside the examiner's reasoned decision and to simply accept Jawbone's unsupported argument that the claims of the '812 patent are routine, ordinary, and conventional. But this is not how decisions are made under Section 101.

Moreover, Jawbone's criticisms of the examiner's allowance are misplaced. Jawbone, for example, criticizes the examiner's allowance as "without any detailed analysis." Jawbone Br. 17. This is not so. The examiner was under an obligation to "review the totality of the evidence (*e.g.*, the specification, claims, relevant prior art) before reaching a conclusion with regard to whether the claimed invention sets forth patent eligible subject matter." Manual of Patent Examining Procedure § 2106 (9th ed., Mar. 2014) (Ex. F). And he did. The examiner reviewed hundreds of references in the prosecution files—even providing particularized analysis of seven specific references—and concluded that "the prior art fails to teach or suggest the step of scheduling the notification message for display on the mobile device at a specified dat[e] and time." Jawbone Ex. 11 at 2–5; *see also id.* at 5 ("[T]he prior art does not disclose scheduling this message for display at a *specified date and time or for a time window*."). There is nothing insufficient about the examiner's analysis.

1    Nor is there anything inconsistent with the examiner's analysis and the Federal Circuit's

2 decision in *Bascom*.  The court in *Bascom* found that "narrow[ing] the scope of protection through

3 additional '*conventional*' steps for performing the abstract idea . . . [does] not make those claims any

4 less abstract." 827 F.3d at 1352 (emphasis added).  Contrary to *Bascom*, however, the examiner

5 reviewing the '812 patent application concluded that the applicants had "added *unconventional* steps

6 that confined the claim to a particular useful application" and rendered the claim eligible.  Jawbone

7 Ex. 11 at 2 (emphasis added); *see Mayo*, 132 S. Ct. at 1300 (explaining that a claimed process was

8 patent-eligible because it included "several unconventional steps . . . that confined the claims to a

9 particular, useful application of the principle").

10    Finally, the claims also contain an inventive concept under the Federal Circuit's decision in

11 *DDR Holdings*.  Here, as in *DDR Holdings*, because the '812 patent is directed to a solution "rooted

12 in [portable activity monitoring device] technology in order to overcome a problem specifically

13 arising in the realm of [portable activity monitoring devices]," it "amounts to an inventive concept."

14 773 F.3d at 1257, 1259.  In particular, the '812 patent is directed to an improved notification system

15 for portable activity monitoring devices that addresses the problem of notifications going unnoticed

16 by users because they were unavailable or occupied when the notification came up.  *See supra*

17 Section III.B.1.  The asserted claims of the '812 patent are thus patent-eligible.

18    **C.    The '971 Patent Is Directed to Eligible Subject Matter**

19    Jawbone's mere two pages of argument regarding the '971 patent at the end of its brief—

20 especially when Jawbone's brief was not short on space—further evidences Jawbone's shotgun and

21 indiscriminate approach to Section 101.  The asserted claims of the '971 patent are comparable to

22 those found eligible by the Federal Circuit in *Enfish*, *AMDOCS*, and many other recent cases.  In

23 particular, the '971 patent describes technological improvements—including a specific and

24 unconventional combination of hardware and software—to address issues of battery life in portable

25 activity monitoring devices that include a heart rate monitor.  *See Enfish*, 822 F.3d at 1336;

26 *AMDOCS*, 2016 WL 6440387, at *10.  In its cursory discussion of this patent, Jawbone presents no

27 evidence and no legitimate reasons why this Court should find this patent ineligible.

28

1.   **The '971 Patent Is Directed to a Specific Combination of Hardware and Software that Improves the Technology of Portable Activity Monitoring Devices With a Heart Rate Monitor**

At the time of the invention, "[r]ecent advances in sensor, electronics, and power source miniaturization ha[d] allowed . . . personal health monitoring devices . . . to be offered in small sizes." '971 patent at 1:20–24; Ex. A (van der Weide Decl.), ¶ 14.  It was recognized at the time, however, that constantly operating a heart rate monitor in a small device would drain the battery quickly.  Ex. A (van der Weide Decl.), ¶ 14 (citing Ex. E (Gasparrini et al.) at 1).  Thus, "energy conservation [was] important for portable devices with multiple functions and miniature size." '971 patent at 1:60–62.  To address this issue, those of ordinary skill in the art sought ways "to activate the [heart rate] sensor on demand, because it reduces energy consumption compared to continual, continuous, or regularly intermittent activation." *Id.* at 1:57–59.

Further complicating the problem, however, is determining when and how to activate and operate the heart rate sensor.  *See* Ex. A (van der Weide Decl.), ¶¶ 15–16.  The inventors recognized that, at the time of the '971 patent, "existing devices that measure[d] momentary heart rate require[d] cumbersome user interaction to take the measurement, display the measured information and/or provide other user feedback." *Id.* at 1:30–35.  If the process of operating the heart rate sensor is too complicated—requiring "multiple gestures, e.g., separate gestures to turn on the heart rate sensor, start heart rate data collection, [and] provide user feedback based on heart rate data"—it would restrict users from easily obtaining heart rate measurements at certain times, such as when moving or exercising. '971 patent at 1:64–66.

To solve this problem, the inventors of the '971 patent found that "it is desirable to activate the [heart rate] sensor using only a single user-gesture as opposed to multiple gestures." *Id.* at 1:63–65; *see also id* at 1:51–52 ("Heart rate monitoring activated by a single user-gesture is desirable.").  To allow activation of a heart rate sensor by a single user-gesture, the inventors introduced a new hardware component: a distinct "activator" for the sensor.  *See id.* at 2:6–32.  The '971 patent describes the "activator" as "a mechanism through which a user input or activation signal may be received or recognized by the device in order to initiate heart rate measurement via the heart rate sensor." *Id.* at 8:63–66.  The patent provides several examples of the activator:   "In some

21

embodiments, the activator 116 is also a biometric sensor, such as an accelerometer serving as both an activator of the heart rate sensor and as a motion sensor. In other embodiments, the activator may be a single-purpose device, e.g., a touch sensor or button." *Id.* at 8:58–63.

By uniquely incorporating the "activator" into the portable activity monitoring device, the device can recognize a single user-gesture to begin the heart rate monitoring. The single user-gesture to activate the sensor "is an action of a user relative to a single part of the apparatus, wherein the action is interpreted by the apparatus as a single behavioral pattern," and can include twisting the wrist, shaking the device, touching a single surface of the device, double tapping a part of the device, and much more. *See id.* at 13:41-55. This simplified and improved process of obtaining a heart rate measurement—*i.e.*, using an activator to receive a single user-gesture—"allows users to obtain heart rate measurement[s] . . . under circumstances that are otherwise impossible, impractical, or inconvenient to obtain the measure." *Id.* at 1:67–2:5. In doing so, it also minimizes power consumption, thus addressing the recognized issues of battery life. Ex. A (van der Weide Decl.), ¶ 17.

### 2. Step One: The '971 Patent Is Not Directed to an Abstract Idea

Again, Jawbone's expression of the purported "abstract idea" in the '971 patent falls into the trap the Federal Circuit warned of in *Enfish*: it "describ[es] the claims at such a high level of abstraction and untethered from the language of the claims [thus] ensur[ing] that the exceptions to § 101 swallow the rule." 822 F.3d at 1337. The '971 patent is not about "data collection." *See* Jawbone Br. 18. Nor is it about "filtering" or analyzing "data quality." *See id.* And it is about much more than "measuring heart rate only when the heart rate is strong enough to measure." *Id.* Rather, "the plain focus of the claims is on an improvement to [portable activity monitoring device] functionality itself, not on economic or other tasks for which a computer is used in its ordinary capacity." *See Enfish*, 822 F.3d at 1336.

As explained above, the '971 patent claims a specific improvement to heart rate monitoring hardware and algorithms to address the technical challenges of conserving battery life and allowing easy initiation of a heart rate measurement at any time. *See supra* Section III.C.1. It achieved these advances using a component new in this context—a distinct "activator" that receives a single user-gesture to begin heart rate monitoring. Ex. A (van der Weide Decl.), ¶¶ 16–17. As Fitbit's expert,

22

Dr. van der Weide explains, the use of a distinct activator in this environment was unconventional and innovative in the art at the time. *Id.* ¶ 17.  At most, devices used the heart rate sensor itself to trigger activation of a measurement, not a unique activator.  *Id.*  The ability to use a *single user-gesture* to trigger a heart rate measurement was similarly unconventional.  *Id.*  Dr. van der Weide explains, for example, that many existing devices required users to open up menus or click numerous buttons to trigger a measurement.  *Id.* ¶¶ 15, 17.  Indeed, the '971 patent contrasts the claimed single user-gesture with "existing devices that measure[d] momentary heart rate require[d] cumbersome user interaction to take the measurement, display the measured information and/or provide other user feedback."  '971 patent at 1:30–35.  These concrete, discrete, and significant improvements to portable activity monitoring devices are not "abstract ideas."  *See Enfish*, 822 F.3d at 1339 ("Rather, the claims are directed to a specific implementation of a solution to a problem in the software arts. Accordingly, we find the claims at issue are not directed to an abstract idea.").[6]

Moreover, the asserted claims of the '971 patent are patent-eligible under this step of the inquiry because the improvement captured by the claims "is tied to a specific structure of various components."  *AMDOCS*, 2016 WL 6440387, at *10.  As explained above with respect to the '543 patent, claims that are tethered to a specific and concrete structure of components are not directed to an abstract idea.  *See supra* Section III.A.2.  Here, the asserted claims of the '971 patent do not generically recite triggering a heart rate measurement to save battery life; they define a particular way of doing so, including identifying the "particular tool" (*e.g.*, activator) for the process. *See Elec. Power*, 830 F.3d at 1354.  As such, they are not directed to an abstract idea.

Finally, Jawbone argues that "the apparatus and method claimed by the '971 [patent] can be implemented and achieved by simply putting one's fingers over one's wrist" to manually measure heart rate.  Jawbone Br. 18.  Jawbone essentially contends that *any* patent related to heart rate

---

[6]  The parties' dispute the meaning of the term "activator."  Jawbone seeks to restrict the meaning of "activator" to "a mechanism through which a user input or activation signal may be received or recognized by the device in order to initiate a heart rate measurement via the heart rate sensor." Ex. D (Jawbone Proposed Claim Constructions) at 2.  But Jawbone has not yet explained how its proposed definition differs from the plain and ordinary meaning of this claim term.  This dispute further confirms that judgment on the pleadings would be premature. *See Cave Consulting*, 2016 WL 283478, at *3 (denying motion for judgment on the pleadings until there is a "fuller factual record").

monitoring is abstract because someone could always achieve the same result manually.  Not so.  Using fingers to manually measure heart rate lacks the specific and concrete structure that makes the claims here not abstract, including (significantly) an activator and a heart rate sensor.  Specifically, here, Jawbone fails to explain how fingers comprise either an activator or a heart rate sensor within the meaning of the claims.  The claims are therefore not directed to an abstract idea.

### 3.   Step Two:  The '971 Patent Contains an Inventive Concept

Jawbone also errs in its step two analysis.  In a single paragraph, Jawbone focuses on whether the "feedback" limitations render the invention in the '971 patent concrete.  *See* Jawbone Br. 19.  It is unclear why Jawbone focuses on "feedback" to the exclusion of the numerous other limitations in the claims, but, regardless, such myopic analysis does little to dispatch Jawbone's burden of demonstrating that "the elements of each claim [considered] *both individually and 'as an ordered combination'* . . . 'transform the nature of the claim' into a patent-eligible application."  *Alice*, 134 S. Ct. at 2355 (quoting Mayo, 132 S. Ct. at 1298, 1297) (emphasis added).  Analyzing only one claim limitation does not cut it.

After analyzing the "feedback" limitations, Jawbone concludes—in a single sentence with no citations to any facts or evidence—that "[n]othing of the limitations of the '971 patent's independent or dependent claims, either individually or in an ordered combination, contains an inventive concept." Jawbone Br. 19.  This again does not cut it.  As with the other two patents, Jawbone hopes this Court will simply take its word that the claims lack an inventive concept.  Such "unsupported argument provides no valid basis for dismissing any claim." *Shafer*, 2008 WL 4367291, at *6; *see also Kensu*, 2015 WL 5317061, at *2 ("Defendants cannot succeed on a Motion for Judgment on the Pleadings by making unsupported arguments that factually contradict the Plaintiff.").  Jawbone fails to specifically address all claims at issue—both independent and dependent.  This is insufficient.

Jawbone's conclusion is also demonstrably false.  The claims of the '971 patent claim much more than generic computer components, and do not simply instruct someone to apply an abstract idea on a computer.  *See* Jawbone Br. 17; *Bascom*, 827 F.3d at 1349.  As Dr. van der Weide explains, implementing an activator as claimed in the '971 patent is unconventional in the context of portable activity monitoring devices with a heart rate sensor.  Ex. A (van der Weide Decl.), ¶ 17.  A typical

24

approach at the time required "cumbersome user interaction," like navigating menus.  '971 patent at 1:30–35; Ex. A (van der Weide Decl.), ¶ 15.  The activator, which responds to a single user-gesture, improved and simplified the activation process for the heart rate sensor.  *See id.* ¶¶ 15–17.

While the specification indicates that the activator may be one of a number of existing technologies (*e.g.*, biometric sensor, touch sensor, or button), *see* '971 patent at 8:58–63, the term is not limited to such technologies.  The fact that these technologies were known does not change the analysis under step two.  For example, in *CellzDirect*, the Federal Circuit found that repeating a known freeze-thaw cycle multiple times for certain cells rendered a claim patentable because it had not been practiced in the context of the cells at issue.  827 F.3d at 1049–50.  Similarly, here, it was unconventional to implement these known technologies as an "activator" in the context of portable activity monitoring devices with a heart rate monitor.  Thus, when those technologies are implemented as the "activator" in this context, it presents a "particular arrangement of elements [that] is a technical improvement" in the operation of a portable activity monitoring device.  *Bascom*, 827 F.3d at 1350.  Indeed, that is the precise situation in *Bascom*, in which, though each claim element (in isolation) was known in the art, the Federal Circuit found an inventive concept in "the non-conventional and non-generic arrangement of known, conventional pieces."  *Id.*  The claimed arrangement here is similarly unconventional.

Finally, the '971 patent is directed to a solution "rooted in [portable activity monitoring] technology in order to overcome a problem specifically arising in the realm of [portable activity monitors]."  *DDR Holdings*, 773 F.3d at 1257.  As explained above, the '971 patent improves the technology of portable activity monitoring devices by introducing an "activator" that triggers measurement of a heart rate on a single user-gesture, thereby conserving battery power.  As such, the asserted claims of the '971 patent therefore contain an inventive concept.

## IV.     CONCLUSION

For the foregoing reasons, Fitbit's Asserted Patents are directed to eligible subject matter under 35 U.S.C. § 101.  Fitbit therefore respectfully requests that the Court deny Jawbone's motion for judgment on the pleadings.

1

Date:     November 18, 2016

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,
GIBSON, DUNN & CRUTCHER LLP

By:     */s/ Frederick Chung*

JOSH A. KREVITT (SBN 208552)
jkrevitt@gibsondunn.com
200 Park Avenue, 47th Floor
New York, NY 10166
Tel:  (212) 351-4000
Fax:  (212) 351-4035

WAYNE M. BARSKY (SBN 116731)
wbarsky@gibsondunn.com
JASON C. LO (SBN 219030)
jlo@gibsondunn.com
2029 Century Park East
Los Angeles, CA 90067-3026
Tel:  (310) 552-8500
Fax:  (310) 551-8741

MARK N. REITER (*Pro Hac Vice*)
mreiter@gibsondunn.com
2100 McKinney Avenue
Dallas, TX 75201-6912
Tel:  (214) 698-3100
Fax:  (214) 571-2900

FREDERICK S. CHUNG (SBN 183337)
fchung@gibsondunn.com
Y. ERNEST HSIN (SBN 201668)
ehsin@gibsondunn.com
NEEMA JALALI (SBN 245424)
njalali@gibsondunn.com
1881 Page Mill Road
Palo Alto, CA 94304
Tel:  (650) 849-5300
Fax:  (650) 849-5333

*Attorneys for Plaintiff Fitbit, Inc.*

PLAINTIFF FITBIT, INC.'S OPPOSITION TO JAWBONE'S MOTION FOR JUDGMENT ON THE PLEADINGS
CASE NO. 5:16-CV-00118-BLF

**CERTIFICATE OF SERVICE**

I, Frederick Chung, hereby certify that on November 18, 2016, I did cause to be electronically filed the foregoing document with the Clerk of the Court via CM/ECF. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing systems.

Dated:     November 18, 2016                    GIBSON, DUNN & CRUTCHER LLP


By:   _/s/ Frederick Chung_

PLAINTIFF FITBIT, INC.'S OPPOSITION TO JAWBONE'S MOTION FOR JUDGMENT ON THE PLEADINGS
CASE NO. 5:16-CV-00118-BLF